**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **NOURIJAN KEVRANIAN d/b/a NUTS FOR CANDY**, a Sole Proprietorship, and **CATHY HOUTS**, on behalf of themselves and all others similarly situated, | No.   1:24-cv-7997 |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| **VISA INC.** | **JURY TRIAL DEMANDED** |
| Defendant. | |

**Table of Contents**

Page

I.     INTRODUCTION ................................................................................................ 1

II.    NATURE OF THE CASE ................................................................................... 3

III.   JURISDICTION, VENUE AND COMMERCE ................................................ 8

IV.    PARTIES ........................................................................................................... 8

V.     DEBIT TRANSACTIONS ................................................................................ 9

      A.     Overview of How Debit Transactions Take Place .................................. 9

      B.     How Debit Networks Function and Visa Profits .................................. 15

            1.     Issuing Banks Choose Visa and Interlink as the Enabled Networks ........ 15

            2.     Visa Imposes Per-Transaction Fees and Fixed Fees ................................. 16

            3.     PIN Networks Compete for a Small Fraction of Debit Transactions ....... 17

            4.     Fintech Companies Could Facilitate Alternative Debit Networks .......... 20

VI.    VISA'S DECADES OF MONOPOLIZATION THROUGH EXCLUSIONARY
      AND ANTICOMPETITIVE CONDUCT CONTINUES TODAY ........................... 20

      A.     Visa's Historic Acquisition and Maintenance of a Debit Card Network Services
            Monopoly ............................................................................................... 20

            1.     Visa Dominates Debit Through Its Signature Debit Product .................... 21

            2.     Visa Forces Banks and Merchants to Route PIN Debit Transactions
                Through Interlink .................................................................................... 23

            3.     The Durbin Amendment Threatens Visa .................................................. 24

      B.     Visa Unlawfully Hinders PIN Networks from Competing ................................. 26

            1.     Visa Inhibits Competition and Innovation Through Restrictive Contracts
                with Merchants and Acquirers ................................................................. 28

            2.     Visa Prevents Debit Competitors' Growth Through Contracts with Issuers
                .................................................................................................................. 32

            3.     Visa Evaded the Effects of the Durbin Amendment to Maintain Its
                Monopoly ............................................................................................... 34

            4.     Visa Uses its Monopoly Powers to Obstruct Its Rivals from Gaining Scale
                .................................................................................................................. 35

      C.     Visa Uses Monopoly Power to Interfere with Innovative Alternatives Before They
            Are Able to Compete ................................................................................ 38

|     |     | 1.  | FinTech Alternatives Would Pose an Existential Threat to Visa ............ 40 |
|     |     | 2.  | Visa Wielded Its Debit Monopoly to Prevent that Existential Threat from Becoming Reality................................................................................. 44 |
|     |     | 3.  | Visa Pays Potential Competitors Hundreds of Millions Not to Compete. 47 |
|     | D.  | Key Players at Visa Enforced the Monopoly........................................... 48 |

**VII.**   **ANTICOMPETITIVE EFFECTS**.................................................................... **50**

**VIII.**  **NO COUNTERVAILING FACTORS** ............................................................ **53**

**IX.**    **RELEVANT DEBIT MARKETS**.................................................................... **54**

|     | A.  | Geographic Market ................................................................................. 54 |
|     | B.  | Relevant Product Markets....................................................................... 55 |
|     |     | 1.  | General Purpose Debit Network Services.................................... 55 |
|     |     | 2.  | General Purpose Card-Not-Present Debit Network Services .................. 58 |

**X.**     **VISA HAS MONOPOLY POWER IN THE RELEVANT MARKETS** .................. **59**

**XI.**    **CLASS ALLEGATIONS** ............................................................................ **63**

**XII.**   **CONTINUING VIOLATION** ...................................................................... **66**

**XIII.**  **CAUSES OF ACTION** .............................................................................. **66**

|     | A.  | Count One: Monopolization of the Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in the United States in Violation of Sherman Act § 2 .......................... 66 |
|     | B.  | Count Two: Attempted Monopolization of the Markets for General Purpose Debit Network Services and General Purpose Debit Card-Not-Present Debit Network Services in the United States in Violation of Sherman Act § 2 ............ 67 |
|     | C.  | Count Three: Unlawful Agreements Not to Compete in Violation of Sherman Act § 1................................................................................. 68 |
|     | D.  | Count Four: Unlawful Agreements that Restrain Trade in Violation of Sherman Act § 1................................................................................. 69 |
|     | E.  | Count Five: Violation of the Cartwright Act (Cal. Bus. & Professions Code §§ 16700 *et seq.*)......................................................................... 70 |
|     | F.  | Count Six: Violation of Unfair Competition Law (Cal. Bus. & Professions Code §§ 17200 *et seq.*)......................................................................... 72 |

**XIV.**  **PRAYER FOR RELIEF**............................................................................ **73**

**XV.**   **JURY DEMAND** .................................................................................... **73**

*"Visa's unlawful conduct affects not just the price of one thing—but the price of nearly everything."* Attorney General Merrick B. Garland (September 24, 2024).

## I.    INTRODUCTION

1.    Visa maintains a monopoly over debit network markets by using its dominance to thwart the growth of its existing competitors and prevent others from developing new and innovative alternatives. Visa's systematic efforts to limit competition for debit transactions have resulted in billions of dollars in additional fees imposed on American consumers and businesses and cuts off competition where it should occur today. This harmful and pernicious conduct must be addressed; consumers and businesses should not be made to bear the brunt of corporate greed.



2.    Visa operates the largest card network in the U.S. and thereby sits at the center of many consumers' daily payments by providing the infrastructure that debit and credit card payments run on. Visa handles more than 60% of debit card transactions in the U.S. and collects more than $7 billion in annual processing fees. These $7 billion in fees, which are largely invisible to the public, are paid by merchants, who, in an effort to recoup profit, pass on the fees to consumers by raising the prices of goods and services. To ensure its dominance in the debit market

and maintain its 83% operating margins, Visa imposes a web of exclusionary agreements on merchants and banks.

3.    Visa uses carrots and sticks to lock up debit volume, insulate itself from competition, and smother smaller, lower priced competitors.  For carrots, Visa offers discounts on volume, and induces would-be competitors to become partners instead of entering the market by offering generous monetary incentives or buying out innovative start-ups that could otherwise grow to compete.  This blunts the risk of innovative new technologies that could advance the industry but would otherwise threaten Visa's monopoly profits and prevents current and potential rivals from gaining the scale, share, and data necessary to erode Visa's existing dominance.  With sticks, Visa penalizes customers who route transactions to a different debit network or alternative payment system.  Visa uses leverage based on the large number of transactions that must run over Visa's payment rails to impose exclusionary commitments on merchants and their banks, as well as on financial institutions that issue debit cards.  These agreements are priced so that, unless all or nearly all debit runs over Visa's payment rails, large disloyalty penalties can be imposed on all Visa transactions.

4.    While merchants and consumers suffer, Visa profits.  Visa collects more from every debit transaction that is run over its network than it would under competition.  If faced with real competition, it would lose volume to competitors and have to lower its fees, or be displaced altogether with a newer, cheaper alternative.  Visa has resorted to unlawful, anticompetitive means to maintain its monopoly and its ill-gotten profits.

5.    Visa's anticompetitive conduct harms consumers and merchants like Plaintiffs and members of the Class.  It ensures that Visa continues to dominate the debit network market in the United States without having to meaningfully compete on the price of fees, driving up costs for all

businesses, which are then passed on to consumers in the form of raised prices on goods and services. Visa prevents innovators and rivals from meaningfully competing with Visa, forcing merchants to remain in overpriced contracts and try to recoup those absurd costs from their customers through surcharges and higher prices.

6.    Plaintiffs bring this case on behalf of themselves and those similarly situated to stop Visa's unlawful conduct, redress past harms, and restore competition to the debit network market.

## II.    NATURE OF THE CASE

7.    Visa acquired its debit network services monopoly during the 1990s by requiring merchants that accepted Visa credit cards also to accept Visa signature debit cards. Because few merchants were willing to drop credit card acceptance, imposing this tying arrangement meant that Visa could assure itself of broad merchant acceptance for its signature debit network. It also meant that whenever a cardholder chose signature debit authentication, a merchant would have to pay the fees Visa dictated. Visa used this power over merchants to put in place a pricing structure in which merchants paid high fees to financial institutions that issued Visa signature debit cards, which in turn created strong incentives for issuers to focus on incentivizing use of Visa signature debit by cardholders. Visa's tying arrangement was challenged by merchants in an antitrust lawsuit that Visa eventually settled by paying billions of dollars. *In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568 (E.D.N.Y. 2003).

8.    Around the same time that Visa was illegally ensuring that signature debit would become predominant in the United States, Visa imposed a rule prohibiting any of its issuing financial institutions from also issuing signature debit cards on competitor networks. The rule ensured that Visa would dominate the large signature debit marketplace that it had illegally created. The Department of Justice challenged that Visa rule and it was found to violate the antitrust laws

3

by a federal district court in New York City and the 2nd Circuit. *United States v. Visa and MasterCard*, 344 F.3d 229 (2d Cir. 2003).

9.      By 2004, the illegal practices that Visa had used to acquire its debit network monopoly had been struck down and eliminated. But by then it was too late. Over 70% of debit cards in the United States bore the Visa brand and nothing in the resolution of the prior antitrust cases changed that.  Visa's debit network pricing reflected its resulting dominant position.

10.     Visa also had already moved to take the next step in protecting and strengthening its debit network services monopoly as the prior antitrust litigation was winding up. Beginning in the early 2000s, Visa negotiated agreements with numerous Visa debit card issuing financial institutions that resulted in Visa's affiliated PIN debit network, Interlink, obtaining sole placement as a PIN debit network on a substantial number of Visa signature debit cards. While Visa had no interest in having PIN debit replace signature debit, by gaining control of a greater share of PIN debit transactions, Visa sought to limit competition for signature debit and ensure that debit network pricing remained high.  Visa used its agreements with debit card issuers to neutralize merchant and acquirer attempts to avoid Visa's high signature debit network pricing by switching to PIN debit. If both the signature debit and PIN debit options on a debit card were controlled by Visa, then merchants and acquirers would have no choice but to send their debit transactions to a Visa-controlled network. As a result of these agreements, Visa's share of debit network transactions grew further.

11.     In July 2010, Congress enacted the Durbin Amendment as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act.  The Durbin Amendment, along with the regulations issued thereunder, required many changes in how debit networks operate, including requirements that (a) issuing financial institutions include at least two networks unaffiliated with

each other on every debit card and (b) merchants have the ability to send their debit card transactions for processing to whichever debit network they prefer.  The former meant that Visa could no longer obtain sole placement for Interlink on Visa signature debit cards.  The latter meant that merchants could choose based on the merits which network to use to process a transaction. Overall, as a result of these changes, Visa was squarely confronted with the prospect of enhanced competition from other debit networks.

12.     Visa did not welcome this new competition. It stated soon after the regulations under the Durbin Amendment were issued that "[r]egulation has dramatically altered the competitive environment in the United States" and warned investors that it likely would lose debit network volume. Visa Q3 2011 Earnings Call Transcript, p. 2.  Visa could have confronted this new challenge with competition on the merits. Even though merchants and acquirers now had an option to process debit card transactions on a non-Visa network, Visa remained free to compete on price, quality, and service to convince those merchants and acquirers to route through Visa on the merits. But Visa chose not to compete on the merits. Instead, Visa chose to tilt the competitive playing field to its advantage. Specifically, Visa adopted a carefully integrated, illegal strategy to preserve and enhance its debit network services monopoly.

13.     Within its dominant position in the market, there are a substantial number of debit transactions in which Visa is the only network available for both the merchant and issuer to use for transactions, making those transactions "non-contestable" by rival networks.  Merchants necessarily rely on these non-contestable transactions, which connect them with customers that would otherwise be inaccessible to them.  Visa leverages these non-contestable transactions to extract routing deals that limit competition for contestable transactions.  On those non-contestable transactions only, the merchant or acquirer pays a list price (known in the industry as the "rack

rate") on any transaction that is routed to Visa's debit network.  Alternatively, the merchant (or acquirer) signs an agreement with Visa and receives a so-called "discount" on all transactions, both non-contestable and contestable.  Visa threatens punitive rack rates if merchants (or their acquirers) route a meaningful share of their contestable transactions to Visa's competitors. Merchants are cornered into signing routing deals sending most of their transactions to Visa, which means that other debit networks cannot compete for those transactions or grow their market share. Those routing deals cover over 180 of Visa's largest merchants and acquirers, insulating at least *75%* of Visa's debit volume from competition. Visa thereby forecloses nearly half of all U.S. debit volume, and renewed these routing deals as of 2022, entrenching its dominance of the debit market for years to come.

14.    Having insulated itself from the Durbin Amendment, Visa took additional anticompetitive steps to prohibit emerging and innovative technologies from eliminating its links between consumers and merchants for debit transactions.  Apple, Paypal, and Square offer valuable payment products to consumers, allowing them to link their debit card credentials to Apple Pay, PayPal, Cash App, and other payment products to make purchases in more convenient and efficient ways.  Their large existing networks that connect merchants and consumers made them a threat to Visa's existing links.  To prevent these and other innovative technologies from encroaching on Visa's control of debit transactions, Visa offers lucrative incentives to these potential competitors under the express condition that they do not compete with Visa's products or links.  These incentives are sometimes hundreds of millions of dollars annually—and when these are not enough, Visa threatens to enforce additional fees.

15.    Visa thus harms competition in the relevant debt markets in at least three ways.

16.     First, Visa takes advantage of its must-have status to exercise its monopoly power and deny a level playing field for its rivals and deprive them of scale. Visa is capable of this conduct because Visa-branded cards comprise a large portion of all U.S. debit cards. Further, merchants must use Visa's network for a significant number of non-contestable transactions.

17.     Second, Visa's conduct forecloses competition in a substantial portion of the relevant debit markets—at least 45% of all U.S. debit transactions and over 55% of card not present debit transactions.  Visa's conduct subverts the competitive process. Visa deprives its smaller rivals of the scale they need to compete effectively on both price and quality. Networks need scale on both the issuer and merchant sides of the market to compete effectively; the lack of scale on one side makes it hard to build scale on the other. Visa's agreements with issuers on the one hand and merchants and acquirers on the other exacerbate its rivals' scale problems on both sides of the market. Today, the non-Visa/Mastercard-owned networks collectively represent only about 11% of all debit transactions and only about 5% of card-not-present debit transactions.

18.     Third, Visa has already secured commitments from several large would-be competitors that they would not unveil products that could threaten Visa's dominance. Rather than engage in fulsome competition, Visa's agreements with these companies, including Apple, PayPal, and Square, have succeeded in transforming these potential competitors into partners to the detriment of competition from those would-be rivals and Visa's own incentives to innovate, and at the expense of American consumers and American merchants of all sizes.

19.     Plaintiffs bring this action under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and pursuant to California state laws to put a stop to Visa's exclusionary and anticompetitive schemes and remedy the harm Visa has caused.  Plaintiffs seek damages in excess of $5 million.

## III.    JURISDICTION, VENUE AND COMMERCE

20.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; there are more than one hundred members of the class; and at least one member of the class is a citizen of a state different from that of the Defendant.

21.    The Court also has jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-2. Plaintiffs seek to recover overcharges and treble damages for injuries sustained by Plaintiffs and the Class resulting from Visa's anticompetitive conduct and foreclosure of competition in the relevant markets that maintained and enhanced Defendant's dominant position and monopoly power. Given that Plaintiffs seek relief for these violations of the Clayton Act and the Sherman Antitrust Act, this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a). The Court possesses supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

22.    Venue is proper in this Court pursuant to, among other statutes, § 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391 because Visa regularly transacts business within this District, is found within this District, a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, and a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District.

## IV.    PARTIES

23.    Plaintiff **NUTS FOR CANDY** is a sole proprietorship owned by Nourijan (John) Kevranian with its principal place of business in Burlingame, California. Nuts for Candy is a family-run shop with collectible stuffed animals and over 400 different candies from all around

the world. Nuts for Candy accepts Visa debit cards as payment for goods. Like all other merchants who accept Visa debit cards, Nuts for Candy is bound by Visa's rules and regulations and has paid supracompetitive, artificially inflated fees and costs, and has sustained injury and damage as a result of Visa's unlawful conduct.

24.    Plaintiff **CATHY HOUTS** is a resident of the State of California who regularly uses her debit card in point of purchase and online transactions at merchants that accept Visa debit cards and was thereby harmed by passed on supracompetitive, artificially inflated fees from Visa that raised the price of goods and services she paid for.

25.    Defendant **VISA, INC.** ("Visa") is a Delaware company with its principal place of business in San Francisco, California. Visa, Inc. owns and operates the Visa debit network, the largest debit network in the United States. Last year, it routed 57.6 billion debit transactions worth $2.8 trillion. Visa provides a two-sided transactions platform that processes debit transactions between businesses, consumers, and banks through authorization, clearance, and settlement. In fiscal year 2023, Visa reported revenues of approximately $32.7 billion, including $14 billion in the United States. Visa engages in interstate trade and commerce, and its activities substantially affect trade and commerce. Visa's services are marketed, distributed, and offered throughout the United States, including across state lines and in this District.

## V.    DEBIT TRANSACTIONS

### A. <u>Overview of How Debit Transactions Take Place</u>

26.    Debit cards are a method of financial transaction which connect to the available balance contained in the holder's checking account and transfer those funds to a merchant's account.  If the funds are not available, the debit card cannot complete the transaction.  Unlike a check, the money does not float until the bank completes the funds transfer.  Rather, the funds

transfer from the customer's account to the seller's account in real time, providing the seller with a guaranteed exchange for their goods for money.

27.     The first prototype of a debit card was introduced in 1966, and the debit card was introduced to the public in the early 1970s.  Referred to simply as "ATM cards," these first generation debit cards had one function: getting cash when needed from an automated teller machine (ATM).  Usage gradually grew throughout the 1970s and 1980s, as ATM infrastructure became more developed.  By the late 1990s, debit cards could be used for point-of-sale transactions in stores, directly debiting funds from a customer's account, thus offering a convenient and real-time payment method.  Issuers also began using more secure square microchips, called EMV chips, to store information rather than magnetic stripes, making debit card transactions more secure.  Contactless payments, enabled by Near Field Communication (NFC), emerged in the 2000s, allowing quick and easy tap-and-go transactions.  As a result, debit cards became increasingly popular and are now a widely used method of payment in the U.S., used by tens of millions of Americans and accepted by merchants everywhere.

28.     On average, more than a third of all US consumer transactions are made with debit cards, outranking both credit cards and cash.  For consumers, the payment process is more or less

## The Visa transaction









**The merchant**
The retailer, restaurant, hotel or airline that accepts Visa.

**The acquirer**
The financial institution that enables merchants to be paid.

**The issuer**
The financial institution that provides Visa cards and payment products.

**The cardholder**
The consumer or business using Visa cards and payment products.

identical no matter what type of card they're using—debit cards have the option of being authenticated with a PIN instead of a signature in physical "card-present" transactions, but for "card-not-present" or online transactions, there's no difference at all.

29.     Debit transactions are processed using debit networks, intermediaries that provide network services to facilitate the processing of debit card transactions. Debit networks provide infrastructure and rules that enable the processing of debit transactions. The networks sell their

**Signature Rail**
These rails are maintained by Visa, Mastercard, and Discover. Transactions can be processed without a PIN. This rail incurs all card network fees for use of the rail.

**VS.**

**Debit Network Rail**
Rails maintained and utilized by a system of regional debit networks. Transactions require PIN or use of PINless technology for processing. Avoids Visa, Mastercard, and Discover network fees.

  
  
    

services to other market participants. Typically, their direct customers are issuers and merchant acquirers.  Debit networks also negotiate pricing directly with some large merchants.

30.     In the United States, two different types of networks have arisen over the past three decades to provide network services for debit card transactions: signature debit networks and PIN debit networks.  On one side are signature debit rails, often referred to as "processing as credit," which are maintained by the major networks like Visa, Mastercard, and Discover. In the other corner is the true network debit rail, which is maintained by regional debit networks like Interlink, Maestro, Accel, STAR, NYCE, Pulse, Jeanie, Culiance, Shazam, and AFFN.  Visa owns Interlink, which captures 47% of the market shares in dollar value.

11

31.    As illustrated below, debit card credentials include several pieces of information. The vast majority of debit cards in circulation in the United States today include a signature debit network (*i.e.*, Visa or MasterCard branded on the front of the card).  Signature debit networks are identifiable not only by the branding typically on the front of the card, but also by the Bank Identification Number ("BIN"). A financial institution will be assigned a BIN (the first six digits on the front of the card) and the identity of the signature debit network will be reflected in the first digit or two ("4" for Visa, "51" through "55" for MasterCard, etc.) of the 16-digit primary account number displayed on its debit cards. Because the signature debit network is "hard coded" in this way onto a debit card, a decision by a signature debit card issuer to switch signature debit networks requires reissuing debit cards.

32.    Over the last couple of decades, the vast majority of debit cards have been issued



not only with a signature debit network (on the front of the card, as described above) but also have included the capability for debit transactions to be processed by at least one PIN debit network (sometimes, but not necessarily, identified on the back of the card). An individual debit card thus generally can support both signature-based and PIN-based transactions at the point of sale.

33.    To initiate a debit transaction, a consumer presents her debit credentials to a merchant.  This triggers a request from the merchant to its bank (the acquirer).  Once the acquiring bank receives the request from the merchant, it sends the consumer's account and transaction information to a debit network like Visa to process the transaction for authorization, clearing, and settlement.  In theory, merchants have a choice about whether to use the front-of-card network on the consumer's card (which is Visa for 70% of debit card payment volume) or a back-of-card network to facilitate the transaction.  But in reality, any choice is illusory.  Because of Visa's exclusionary and anticompetitive conduct, if Visa is the front of card network, the merchant's routing decision uses Visa by default.

34.    Once the debit network receives the customer's account and transaction information, it requests authorization from the issuer bank to approve the transaction.  As long as the consumer has sufficient funds in their account (and, often, if there are no indications of fraud), the issuer bank will authorize the transaction.  Once authorized, the issuer bank puts a hold on the consumer's funds and sends authorization to the debit network, which sends authorization back to the acquirer.  But the debit network will authorize payment only of the funds requested *minus* the interchange fee, which is imposed by the network on the merchant and deducted by the issuer from the amount owed to the merchant.

35.    Finally, the acquirer sends the authorization response to the merchant. The merchant can then complete the transaction..  For each transaction that uses Visa's debit network,

Visa collects several different fees.  This amounts to fees on tens of billions of debit transactions each year.



36.     A typical Visa debit card transaction is for $60 and costs the merchant around 44 cents in fees.  These fees are paid to the merchant's bank.  While a portion of this amount is kept by the acquirer, the majority—around 24 cents—is passed on to the card issuer, such as Chase, Bank of America, or Capital One, in the form of interchange fees, also set by Visa.  These fees fund banking services like checking accounts.  Visa then collects network fees of about 14 cents per transaction from the issuers and acquirers, although four cents are typically returned to these parties in the form of volume discounts.  While incremental, these fees represent billions in profit for Visa, and is passed on to consumers as merchants raise their prices to compensate for the costs of these incremental fees and the fixed monthly fee they also pay Visa.

37.     Most debit card transactions like the one illustrated above take a matter of seconds, whether done in person (a card-present transaction) or online (card-not-present).  For both card-

present and card-not-present transactions, the process for executing the transaction across various banks and the debit network remains the same.  The only slight difference for card-not-present transactions is that these transaction almost never require inputting a PIN, instead relying on other security features like multi-factor authentication.  Card-not-present debit transactions have significantly increased since 2010 and continue to grow, now making up half of all debit spending.

**B.  How Debit Networks Function and Visa Profits**

**1.  Issuing Banks Choose Visa and Interlink as the Enabled Networks**

38.    Issuing banks choose the front-of-card network for their customers.  Debit cards must have a front-of-card network and at least one back-of-card network that is unaffiliated with the front-of-card network.  This does not mean that the back-of-card network actually being used is unaffiliated with the front-of-card network—cards with Visa as the front-of-card network often utilize Interlink, Visa's back-of-card network (shown below).  Consumers have no control over any of these choices, which are set by agreements by their banks with networks like Visa.




39.    These cards also include one or more additional back-of-card network, such as Mastercard's Maestro or a smaller debit network like STAR (shown above), NYCE, or Discover's Pulse.  These smaller debit networks are known as PIN networks because they grew out of ATM networks that required an accountholder to input a PIN number to withdraw money.  Issuers decide which back-of-card network can be used for given debit transactions.  For example, issuers may

choose not to enable back-of-card networks at all for card-present transactions where a PIN was not entered, or for card not present transactions online.

### 2. Visa Imposes Per-Transaction Fees and Fixed Fees

40.     Debit networks like Visa impose a multitude of fees on issuing banks, acquiring banks, and merchants.  Fees include per transaction fees and fixed fees.

41.     Per-transaction fees are imposed by the network for each transaction run on the network, both on the merchant and on the issuer.  Per-transaction fees include interchange fees, which are paid by an acquirer directly and then deducted from what it transmits to the merchant. While debit networks determine the level of interchange fees, such fees primarily operate as a pass-through from the network perspective, with acquirers (and merchants indirectly) effectively paying the interchange fees to issuers. Thus, debit networks typically do not earn revenues from interchange fees.  Rather, the debit network profits from usage of the network through charging network fees.

42.     Network fees are another type of per-transaction fee charged by debit networks to their customers on both the merchant and issuing sides of their business.  The price of that fee varies based on the type of transaction, including whether the accountholder enters a PIN and whether the transaction is card-present or card-not-present.  In most cases, network fees are reflected in a network's contracts with acquirers and issuers, although in some cases networks will negotiate network fees directly with a merchant.  A debit network such as Visa can exercise market power by raising network fees for merchants and acquirers alone, by raising network fees for issuers alone, or both.  On average, acquirers, merchants, and issuers pay higher network fees to have debit transactions processed by signature debit networks like Visa than by PIN debit networks.

43.    Starting in 2012, and in response to the Durbin Amendment, Visa imposed a fixed network fee (called the Fixed Acquirer Network Fee, or "FANF") that is triggered whenever a merchant accepts Visa credit or debit cards.  If a merchant (through its acquirer, refuses to pay this fee, it is no longer permitted to accept any Visa cards.  The FANF is monthly and is based on factors like the number of locations operated by the merchant and the volume of the merchant's card-not-present transactions.

### 3.  PIN Networks Compete for a Small Fraction of Debit Transactions

44.    Debit networks compete separately on both sides of what are sometimes called "two-sided platforms" or "two-sided markets," meaning networks need to attract both merchants and issuers to make the network attractive to all parties and to gain scale.  Issuers are important, not only because networks want to maximize network usage by having as many cards in circulation using the network as possible, but also because a merchant's decision to accept the network is partially a function of how many cards are circulating that can be processed over that network.  Reciprocally, merchant acceptance is important, not only because maximizing network usage requires that cardholders have the ability to use their cards at as many different points of sale as possible, but also because issuers prefer networks with wider merchant acceptance.  This feedback loop is known as "network effects."

45.    After decades of anticompetitive conduct solidified Visa as the default front-of-card network, network effects are not a problem for Visa.  Given Visa's existing agreements locking in issuers and merchants, it is nearly impossible for smaller, rival PIN debit networks to build scale on both sides of the market.

46.    Unlike signature debit networks that evolved on the infrastructure of credit card networks, PIN debit networks evolved using the physical infrastructure of the original ATM

networks (also sometimes called electronic funds transfer networks or EFT networks). In a PIN debit transaction, like an ATM transaction, the cardholder typically enters a PIN number that allows the issuer to verify and authenticate a transaction electronically. Also like an ATM transaction, PIN debit networks generally today use a single message for authorization, clearing, and settlement (sometimes called "single messaging"). As a result, in contrast to signature debit with dual messaging, the amount that will be withdrawn from the cardholder's checking account in a PIN debit transaction is posted almost immediately, much like an ATM withdrawal. There were originally dozens of ATM networks (and thus PIN debit networks) and, even though consolidation has occurred, there are still today numerous PIN debit networks, including PULSE, STAR, NYCE, ACCEL, Shazam, Jeanie, Credit Union 24, and AFFN. Visa and MasterCard each own their own PIN debit network in the United States, Interlink and Maestro respectively. These PIN networks have continued to innovate, and developed the abilities to process "PINless" debit transactions like those online or where customers do not enter a PIN in-person.

47. Visa's rules and terms in merchant and acquirer contracts require them to route the vast majority of their debit transactions to Visa and lock up a substantial portion of debit transaction volume. Visa's non-contestable transactions means that it can lock in even more volume that rivals cannot compete for. These transactions are non-contestable because those back-of-card networks are not available for particular transaction types, such as transactions over a certain dollar amount or transactions that fail to meet particular encryption criteria. Card-present transactions may be non-contestable if the issuer does not allow the network to process card-present PINless transactions and the network's PIN option is unavailable because the merchant chooses not to prompt customers to enter a PIN. Moreover, acquirers may not enable smaller PIN networks. Card-not-present transactions may be effectively non-contestable if they are tokenized,

an encryption technology used to facilitate some Visa-branded debit card transactions initiated online, in a mobile app, or with a digital wallet.  Only a tiny fraction of card-not-present tokenized transactions were routed over an unaffiliated networks' rails in 2023.  Non-contestable transactions comprise a significant percentage of Visa-branded debit card transactions.  This is in part due to issuers historically not enabling card-not-present PINless transactions—at times at Visa's prompting—which had deterred merchants and acquirers from enabling card-not-present PINless acceptance.

48.    Further, the FANF described above, which is a fee charged for having access to Visa's network, excludes rival debit networks from undercutting any network price increase or contestable transactions.  The only way a rival network could make an offer that would allow a merchant to avoid the price increase would be to persuade a merchant to drop Visa.  Dropping acceptance of Visa credit cards is not a practical option for the vast majority of merchants.  *See, e.g., United States v. Visa, Inc.*, 163 F.Supp.2d 322, 340 (S.D.N.Y. 2001) (merchants "cannot refuse to accept Visa and MasterCard even in the face of significant price increases because the cards are such preferred payment methods that customers would choose not to shop at merchants who do not accept them").  Given the huge number of Visa cards held by consumers and Visa's consequent "must have" status, merchants have no realistic choice other than to accept Visa and its exclusionary terms which prevent merchants from routing at least the non-contestable transactions to rival, cheaper PIN networks.

### 4.  Fintech Companies Could Facilitate Alternative Debit Networks

49.    Alternative rails have been developed by fintech companies that provide a way to make debit purchases outside of debit cards.  These alternative networks can facilitate consumer-to-merchant payments by providing end-to-end functionality in which payment is authorized from

a consumer's bank account, communications are facilitated with the bank to authorize and clear the transaction, and payment is initiated to the merchant's financial institution through money transfer services like Automated Clearing House (ACH) or Real Time Payment (RTP) networks. Both are more direct, lower-cost alternatives to Visa's debit card network.

50.    These alternatives would remove Visa from its place as the dominant middleman between consumers' bank accounts and merchants.  With services like a credential to be used at merchants that are members of the network, payment guarantees, dispute capabilities, chargeback capability, and fraud protection, these alternatives could become equivalent to debit card networks like Visa.  Visa certainly fears any encroachment or supplantation by these alternatives if fintech companies chose to pursue their full capabilities in a fair and efficient market.

## VI.    VISA'S DECADES OF MONOPOLIZATION THROUGH EXCLUSIONARY AND ANTICOMPETITIVE CONDUCT CONTINUES TODAY

### A.    Visa's Historic Acquisition and Maintenance of a Debit Card Network Services Monopoly

51.    Over the past three decades, Visa has acquired and maintained a general purpose debit card network services monopoly.  Starting in the 1970s, regional ATM networks were developed, in which deposit-taking financial institutions began to allow their customers to use PIN-authenticated cards and ATMs to withdraw funds from their deposit accounts. By 1987, there were more than a hundred regional and local ATM networks operating in the United States.  ATM networks eventually evolved to add PIN point-of-sale functionality at merchants. Many ATM networks, including PULSE, STAR, NYCE, and Accel/Exchange thus also became PIN debit networks.

52.    The PIN debit networks worked with financial institutions to promote the growth of debit in the 1980s and 1990s. To promote PIN debit, the PIN debit networks and merchant acquirers encouraged merchants to accept PIN debit cards. In most situations, the PIN debit

networks set very low interchange fees, which made acceptance of PIN debit cards attractive for merchants. During the 1980s and 1990s, it was common for financial institutions to participate in numerous PIN debit networks and for the logos of those networks to be displayed on debit cards.

### 1. Visa Dominates Debit Through Its Signature Debit Product

53.     By contrast to PIN debit's initial strong growth, prior to the 1990s, Visa and MasterCard's signature debit network products had limited success. Because a signature-based system introduced risks that were not associated with PIN authentication, financial institutions only issued signature debit cards to their most creditworthy customers. Given these limitations, by 1990, signature debit cards were viewed as a niche product with, at best, a limited future.  PIN debit was growing at an annual rate of over 40 percent, and Visa recognized that PIN debit was poised to take off with or without Visa's participation.

54.     Visa launched a strategy intended to push the U.S. debit network marketplace away from PIN debit and toward signature debit, which was to and offer issuers signature debit interchange fees (paid by merchants) that were much higher than PIN debit interchange fees and similar to standard credit card interchange fees.  These higher interchange fees made more attractive to issuers, and less attractive for merchants, which faced paying higher interchange fees for many transactions.

55.     To force merchants to accept a product that was not attractive to them, Visa tied merchant acceptance of the signature debit product, Visa Check, to acceptance of Visa credit cards. Visa used its "Honor All Cards" rules to require merchants that accepted Visa credit cards also to accept Visa signature debit card transactions. Because few, if any, merchants accepting Visa credit cards could afford to drop such acceptance, Visa was able to force merchants to accept a less desirable product.

56.     With merchant acceptance at credit card-like interchange fees locked in, Visa's strategy by the early 1990s motivated financial institutions to adopt its debit network, adding Visa branding to the front of the cards and relegating the regional PIN debit marks to the back of the card.  Cards that once only had PIN debit functionality now had both signature and PIN debit functionality, and the PIN debit component was deemphasized.  Eventually, some issuers eliminated the PIN debit marks from their cards altogether.  Issuance of Visa signature debit cards rose rapidly after 1993, and many financial institutions took various steps to suppress PIN debit usage. Visa quickly became the dominant network provider for signature debit cards in the 1990s.

57.     The tying arrangement that Visa used to obtain this dominant position was challenged as an antitrust violation.  *In re Visa Check/MasterMoney Antitrust Litig*., 2003 WL 1712568 (E.D.N.Y. 2003). Visa eventually settled the lawsuit in 2003, agreeing, among other things, to eliminate the tying rule and pay billions of dollars to merchants.  But by the time of the settlement, Visa had obtained a substantial cardholder base with Visa signature debit cards and was already entrenched as the dominant signature debit network. With the large cardholder base using debit cards, merchants could no longer practically drop acceptance of Visa signature cards even without the tying arrangement and few, if any, did.

58.     Visa also took further illegal steps to ensure that it would dominate the signature debit space and that it would only face competition from MasterCard. Between 1991 and 2004, Visa maintained an exclusionary rule that precluded financial institutions that were members of Visa from issuing signature debit cards over any network other than Visa or MasterCard.  As a result, networks such as Discover or American Express could not use their credit card networks to also offer a signature debit network product and compete with Visa's dominant position.  The Department of Justice challenged the exclusionary rule and it was found to violate the antitrust

laws. *United States v. Visa and MasterCard*, 344 F.3d 229 (2d Cir. 2003). But by this time, Visa had already created a debit network monopoly.

### 2. Visa Forces Banks and Merchants to Route PIN Debit Transactions Through Interlink

59.     By the late 1990s, while Visa dominated signature debit, it had only a modest position in PIN debit, based on its ownership of a PIN debit network, Interlink, which it acquired in 1991. While merchants could not refuse to accept Visa's expensive signature debit cards if they wanted to also accept Visa credit cards, they could attempt to prompt cardholders to use the lower cost back-of-card PIN debit networks by encouraging customers to enter their PIN number. As volumes were diverted from signature debit to PIN debit through prompting, Visa lost debit volumes to rival PIN debit networks.

60.     To reduce this threat and bolster its own position, Visa increased PIN debit interchange rates charged to merchants and acquirers for its PIN debit network, Interlink, and sought de facto exclusive placement from issuers for Interlink as the sole PIN debit option on debit cards. By 2004, Visa had entered into debit deals with large numbers of major debit card issuing financial institutions. These deals incented financial institutions to issue virtually all of their signature debit cards as "Visa/Interlink" cards (*i.e.*, both the signature option (Visa) and the PIN option (Interlink) were Visa owned networks) and left merchants no choice but to route all PIN debit transactions initiated on these cards over Visa's Interlink network. To entice financial institutions to issue Interlink on an exclusive (or near-exclusive) basis, Visa offered them large volume-based rebates from the fees and assessments that these issuers paid Visa for various services, as well as substantial upfront "marketing" payments. By the time of the Durbin Amendment and regulations, Interlink's share of PIN debit transactions had grown to around 40-50 percent.

61.     With other PIN debit marks removed from debit cards, merchants had little or no choice but to accept the price that Interlink charged. Merchants could not route transactions to a cheaper PIN debit network.  Moreover, if merchants rejected acceptance of Interlink, they would merely cause the transaction to be shifted to Visa's even more expensive signature debit network. The large number of debit cards with Visa as the exclusive network led to a dramatic increase in PIN debit interchange rates.  Visa was able to obtain a high share of PIN debit and narrowed the merchant cost gap between signature and PIN debit interchange to slow the erosion of signature debit volume to PIN debit.

### 3.  The Durbin Amendment Threatens Visa

62.     On July 21, 2010, President Obama signed into law the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. Law 111-203. Pub. Law 111-203, 124 Stat. 1376 (2010). This law contained a set of provisions—commonly referred to as the Durbin Amendment—relevant to debit networks. *See* Section 920 of the Electronic Fund Transfer Act ("EFTA"), codified at 15 U.S.C. § 1693o-2a.

63.     The Durbin Amendment required each debit card to support at least two unaffiliated networks.  No longer could Visa mandate that only Interlink be the lone back-of-card PIN network. Instead, Interlink would have to compete at the point-of-sale for routing priority with the unaffiliated network.  The potential loss of its predominant position as a PIN debit network not only risked lost profits from lower PIN debit network volumes, but also its signature debit business.

64.     However, the Durbin Amendment also set maximum limits on the interchange fees that merchants and their banks pay "regulated issuers" (banks with more than $10 billion in assets) for every debit transaction. The interchange cap has a no-evasion rule, which limits a network's ability to provide incentives to issuers by paying them more than the cap.  These limits on

incentives made it even more challenging for Mastercard or other networks to win front-of-card placement where Visa was the incumbent network because they often could not fully compensate the issuer for its switching costs.

65.     After the Durbin regulations were issued, Visa publicly announced that it was adopting a new debit strategy. Visa stated that these changes were made to "adapt to the new United States regulatory environment." Visa Q3 2011 Earnings Call Transcript, p. 2.  This new overall debit strategy Visa dubbed a "comprehensive integrated debit strategy." Visa Q2 2012 Earnings Call Transcript, p. 4.

66.     Under the "PAVD mandate" Visa changed its network rules to require that any financial institution that issues a Visa signature debit card must accept PIN-authenticated transaction over Visa's signature debit network.  Issuers had to either include Interlink on Visa signature cards or enable PAVD.  Issuers would face substantial fines and penalties if they did not comply, guaranteeing that even if Visa loses a competition with a back-of-card network for PIN placement, it would win PIN placement anyway.

67.     The new fixed acquirer fee, FANF, described above, similarly was implemented to insulate Visa in response to the Durbin Amendment.  Indeed, the new fee was effective on April 1, 2012, the same day that the Durbin Amendment's network exclusivity restriction became effective and Visa noted that it was "part of the total structure we put [in] to deal with the Durbin regulation." Visa Q2 2012 Earnings Call Transcript, p. 9.

68.     Visa did not providing any new service or product in exchange for imposing the FANF. Nor did the new fixed fee achieve any significant cost efficiencies or savings.  Rather, the FANF strategy is simply Visa's exploitation of its merchant-side market power so as to exclude rivals, raise prices, increase profits, and protect its debit network services monopoly.  While the

FANF applies directly to acquirers, the fee is based on merchant participation in Visa's network. Acquirers pass on some or all of the FANF to merchants, who pass it on to consumers in the form of raised prices for goods and services.

### B. Visa Unlawfully Hinders PIN Networks from Competing

69.     Now, Visa is one of the most profitable companies in the United States, with a global operating income of $18.8 billion and an operating margin of 64% in 2022. Visa's North America operating margins are at 83%, making it one of its most profitable regions.

70.     Visa's U.S. debit business is its larges source of revenue globally, earning Visa %5.6 billion in net revenue on over $7 billion in network fees—more than its credit business and more than its debit business in any other region in the world. This revenue reflects Visa's control of over 60% of all debit transactions and 65% of all card-not-present debit transactions in the United States, a share that has hardly budged in years despite regulatory changes, the rise of e-commerce and mobile payments, the introduction of new technology, and a product that should be a competitive commodity. As shown below, the use of debit cards has grown substantially in the



Non-cash payments in the U.S., by select type

Includes payments by consumers, businesses and governments; Every three years; 2015-2021

Data: Federal Reserve; Chart: Erin Davis/Axios Visuals

last decade, and yet new entrants are prevented by Visa from accessing this market.

71.    Visa is the front-of-card brand for over 70% of the debit card payment volume in the United States.  Mastercard, its next biggest rival, is three times smaller, with 25% of front-of-card debit card payment volume.  No other competitor has more than a single-digit share of this market.

72.    Visa faces no financial risk for fraud and faces approximately zero incremental cost for each additional transaction on its network.  Financial risk is borne on the merchant or issuer for any fraudulent transactions for a stolen debit card, not Visa.  Meanwhile, Visa is able to impose prices above what could be sustained in a competitive market, stabilize prices, and depress price competition without pushback.

73.    Visa maintains its monopoly in debit by preventing competitors from gaining scale that would enable them to challenge Visa and by incentivizing would-be competitors away from competing.  Visa's integrated debit strategy is aimed at maintaining and increasing barriers to rival networks by locking up debit volume with merchants and acquirers and accountholders and issuers. By reducing rival PIN debit networks' share of PIN debit transactions, Visa impairs such networks' ability to compete for debit transactions by reducing the networks' overall scale and relevance.  Potential competitors are induced into contracts with Visa and required or further induced not to introduce or support alternatives to Visa's card-based debit rails.  High, punitive fees are imposed by Visa for any merchant, acquirer, issuer, or digital platform that attempts to avoid contracting with Visa.

74.    Visa's dominance is the result of over thirty years of intentional anti-competitive conduct that persists to this day.  To maintain its control of the debit network, rather than compete fairly or innovate, Visa has and continues to prevent smaller debit networks from gaining scale and avoid government regulation designed and intended to promote fair competition.

75.    As described above, Visa took steps to insulate itself from the Durbin Amendment's 2012 requirement to support at least one unaffiliated back-of-card network by imposing a new mandate that made this support essentially a nullity, and by throwing its weight behind a fixed fee that guaranteed its continued use and profit.  In 2023, the Federal Reserve adopted Regulation II, clarifying that the Durbin Amendment required that issuers *enable* at least one back-of-card network that is unaffiliated with the front-of-card network for card-not-present transactions—a reissued threat to Visa's dominance.

76.    Visa's reaction to the Durbin Amendment and subsequent regulations has been to use its non-contestable transactions—around 45% of card-present transactions where Visa is the front-of-card network and more for card-not-present transactions—to demand significant volume commitments from merchants, acquirers, and issuers.  These demands mean higher costs and lower availability of choice for consumers.

77.    Visa employs two main methods to obtain these volume commitments.  First, Visa offers acquirers, issuers, and even some merchants incentives borne from its monopoly profits in order to buy exclusivity.  Second, unless merchants and acquirers sign routing agreements that include severe penalties if exclusivity requirements are not met, Visa charges punitively expensive rack rates that artificially increase the cost merchants and acquirers face if they route transactions to a visa competitor.

### 1.  Visa Inhibits Competition and Innovation Through Restrictive Contracts with Merchants and Acquirers

78.    Visa's routing contracts create a carrot and stick for merchants and acquirers—the carrot being discounts on artificially imposed fees through volume agreements, and the stick being punitive rack rates and high fixed fees.  Given the volume agreements' pricing structure, the agreements create an economic incentive to route all volume targeted in the agreements to

Visa/Interlink. A merchant or acquirer can seek to reduce the increased burden of the fixed fee by entering into volume agreements with Visa and meeting the targets. Any merchants or acquirers that do not commit all or nearly all eligible transactions to Visa's network, regardless of whether there is a better or cheaper alternative that is available for those transactions, face exorbitant fees on non-contestable transactions that they must route through Visa.

79.     Visa contracts directly with large merchants and with acquirers that control the routing decisions for merchants that do not have a direct agreement with Visa. In some cases, Visa's agreements are structured such that Visa is placed at the top of the routing table—a ranked list that determines which network a given debit transaction should be routed to amongst the options available on the debit card. Depending on the agreement, the precise mechanism of discounts or rebates may involve reducing debit network or other fees, providing lump sum rebates, reducing or rebating the FANF directly, or reducing some other revenue stream that Visa charges to merchants or acquirers. The discounts or rebates have a cumulative structure such that a merchant or acquirer risks losing the benefit of the discounts or rebates across all the targeted volume if it does not meet the volume or share targets. Visa has over 100 such volume agreements with key merchants and acquirers. Visa Investor Day, p. 24 (June 6, 2013). Merchants representing hundreds of billions of dollars of 2023 debit payment volume have signed contracts to route 100% of their eligible debit volume to visa.

80.     If Visa is not placed at the top of the routing table, Visa threatens to or does charge merchants and acquirers high rack rates for non-contestable transactions that are routed to Visa. These rack rates artificially increase the cost merchants and acquirers face if they route transactions to a Visa competitor. This is cliff pricing—all-or-nothing fee requirements on volume commitments. If merchants fall even .01% short on their volume commitments, Visa can impose

significant monetary penalties on *all* the merchant's Visa debit transactions and claw back any discounts, rebates, or incentives previously paid to the merchant. Visa can also terminate the entire contract early, which may impact the merchant's credit and debit transactions.

81.    Merchants and acquirers are thus forced to place Visa at the top of its routing table to meet the targets, causing rival PIN debit networks lose all of their volume at such merchants on any transaction in which Visa is a routing option. Visa's rack rates are frequently higher than the PIN networks' rack rates. Yet if merchants want to secure better rates from Visa, they typically need to route all or almost all their Visa-eligible debit volume over Visa rails. Most of Visa's volume commitments are significant, with a minimum threshold of 90–100% of the merchant's or acquirer's eligible Visa volume. Thus, Visa leverages merchants' lack of choice for the non-contestable transactions to secure volume for additional transactions at higher rates than it would be able to secure in a competitive market.

82.    Consider a hypothetical merchant that has a Visa routing commitment with the described cliff pricing structure. In a single day, the restaurant has one hundred customers who present Visa debit cards that have, for example, Pulse as the back-of-card network. Fifty of those customers order online in card-not-present transactions, which may be contestable by Pulse. The other fifty customers present their Visa cards in person. These in-person customers do not have cards that are enabled for card-present PINless transactions over Pulse, and the customers do not enter a PIN when prompted to do so at the point of sale terminal. These in-person transactions are non-contestable.

83.    Under the terms of the routing agreement, the merchant can only avoid rack rates on the fifty contestable transactions if it routes all one hundred transactions to Visa. The merchant can either pay the hypothetical rack rate of $0.50 per transaction on the 50 contestable transactions

totaling $25 plus any PIN network fees and the fees on the 50 non-contestable transactions, or the discounted volume rate of $0.25 per transaction on all 100 transactions. The only way the smaller PIN network would be able to make their network desirable would be to route the transactions for free, which still only compensates merchants for the penalties Visa imposes. PIN networks cannot route for free, so the cliff pricing structure forces merchants into essentially exclusive dealing relationships with Visa for the vast majority of their volume of Visa debit card transactions.

84.     Even some acquirer processors that operate rival PIN networks have agreed to exclusive routing deals with Visa. Visa has provided incentives in exchange for volume commitments from such acquirers. Visa's payments disincentivize these competitors from using their own networks to vigorously compete. As a result of Visa's cliff pricing, for a PIN network to win a meaningful set of transactions away from Visa, it must do two things. First, the PIN network must offer a better per-transaction price than Visa. Second, and more significantly, the PIN network must also compensate the merchant for the penalty Visa will impose on all the transactions the merchant still has to route to Visa, which is larger than the set of transactions for which the PIN network can compete. To compensate some merchants for the loss of Visa incentives on Visa-eligible debit transactions, the PIN network may have to offer zero or negative per-transaction prices. These penalties reflect significant and cost-prohibitive barriers to expansion for the PIN networks.

85.     Visa also offers incentives on their other products, like credit, to secure even more debit routing exclusivity. Visa recognizes that merchants cannot choose to route contestable debit transactions away from Visa if doing so will mean higher fees on non-contestable debit *and* credit transactions that are run through Visa.

86.     Visa has also introduced fees that it offers to "waive" in exchange for exclusivity (or near exclusivity).  making it difficult for merchants to route transactions to different networks. For example, Visa introduced the FANF in 2012 in response to threats of increased competition once the Durbin Amendment went into effect. Visa has stated the FANF "is not a fee that sits on top of what merchants are paying" (Visa Q3 2011 Earnings Call Transcript, p. 13), but instead is being implemented in an integrated way such that the fixed fee is intertwined with lower variable per-transaction fees.   Visa later reiterated that the "FANF is one part of a much more comprehensive fee restructuring, which was combined with a lowering of our per-transaction cost, in addition to the introduction of merchant incentives to encourage routing."  Visa Q1 2013 Earnings Call Transcript, p. 13.  Visa has raised FANF twice in subsequent years. FANF is another lever that Visa uses to lock-up merchant debit volume: as an incentive to entering into routing volume-commitment contracts.

### 2.  Visa Prevents Debit Competitors' Growth Through Contracts with Issuers

87.     Visa is structuring and enforcing its agreements with issuers in such a way as to penalize the issuer if it does not meet volume targets or participates competitor PIN debit networks in efforts to develop new products to compete with Visa's signature debit business.  In so doing, Visa's conduct serves to reduce the amount of issuer participation with rival PIN networks and products, which in turn denies a critical mass of potential volume that might induce acquirer interest in the product.   Visa's conduct, in contradiction with the purposes of the Durbin Amendment, induces issuers to limit rival PIN networks position and enablement on the back of Visa debit cards.

88.     For example, Visa's issuing contract with JPMorgan Chase explicitly requires that 90% of Chase-issued Visa-branded debit cards enable only one unaffiliated PIN network.  As another example, in 2023, Visa contracted with one of its largest debit-issuing fintech customers

to require only a single non-Visa network on all debit cards issued through the customer's issuing banks. By different tactics, Visa's contracts with both large and small issuing banks accomplish the same goal. Using significant volume incentives, Visa's contracts with almost 1,000 issuers strongly disincentivize listing additional networks. Under these contracts' standardized volume requirements, if the issuer does not maintain annual growth of Visa debit transactions in line with Visa's nationwide debit growth, Visa has the power to impose significant monetary penalties. For instance, if an issuer fails to maintain Visa's annual growth, it may be forced to pay early termination fees of both a percentage of benefits already earned and a fixed, multimillion dollar fee. These volume contracts ensure that Visa's share of issuer transactions will not decrease.

89.    These volume targets incentivize issuers to neither add additional networks nor enable additional transaction types—such as PINless routing—for existing networks. The minimum volume requirement in a 2020 issuing contract, for instance, was designed to prevent a shift to PINless networks or Real Time Payment. Visa drafted the contract to prevent issuers from shifting to PINless by requiring issuers to dump PINless networks if too much volume was being shifted to them. Likewise, Visa agreed to incremental debit incentive deals with several large issuers to make it difficult for those issuers to enable PINless or face-to-face transactions. Additionally, Visa enters agreements with issuer processors—which many smaller issuers rely on to select networks—in order to dissuade those processors from selecting and enabling PINless networks.

90.    Like Visa's routing contracts with merchants and acquirers, Visa's volume requirements in issuing contracts are structured as cliff pricing. Any meaningful shortfall gives Visa the right to impose significant monetary penalties across *all* Visa debit transactions (not just the marginal transactions). If the issuer does not achieve the agreed level of exclusivity in any

given year and that failure is attributable to any affirmative actions by the issuer, including enablement of any additional PIN networks, then Visa has the right to apply significant monetary penalties or even an early termination penalty.

91.     And, similarly to its packaging debit and credit discounts for merchants and acquirers, Visa sometimes leverages discounts on other products, such as its Debit Processing Services (DPS), to win issuer routing volume, similar to how it leverages discounts on other products to win merchant routing volume. Visa has packaged card-brand issuance contracts with its DPS processing services to win business from large banks.

92.     Visa's restrictive issuer contracts reinforce its anticompetitive strategies with merchant and acquirer routing contracts.   By creating artificial barriers to expansion and entrenching non-contestable transaction volume, Visa captures all transactions on a Visa debit card, regardless of a merchant's preferred routing choice.

### 3.  Visa Evaded the Effects of the Durbin Amendment to Maintain Its Monopoly

93.     The Dubin Amendment did not exempt Visa, other debit networks, and issuers from complying with the antitrust laws. Rather, the Dodd-Frank Act, 12 U.S.C. § 5303, which includes the Durbin Amendment, provides that it is complementary to the antitrust laws, including the Sherman Act, and that requirements imposed on companies are in addition to, not to the exclusion of, those provided by the antitrust laws.   Yet Visa's response to the Durbin Amendment and subsequent rule clarifications and regulations from the Federal Reserve has been to relentlessly pursue anticompetitive contracts by leveraging its ill-gotten scale.  Visa penalizes disloyalty from merchants, acquirers, and issuers, keeping them away from PIN networks that generally offer lower prices at the expense of competitors, consumers, merchants, and other market participants.

Visa ruthlessly and nakedly wields the sheer volume of non-contestable transactions in its power to foreclose any possible competition.

94.     Visa has now entered *de facto* exclusive routing contracts with over 180 of its largest merchants and acquirers.  Visa's merchant and acquirer contracts cover over 75% of Visa's debit volume and results in the foreclosure of at least 45% of total U.S. debit volume. This denies competitors the scale necessary to compete effectively, because issuers have a lower incentive to add networks to the debit cards they issue if merchants predominantly route to Visa. Visa's contracts with issuers magnify this problem.  Visa uses its contracts with issuers to incentivize the issuers to make decisions—like choosing to disable card-present PINless or choosing not to enable it—that may make more transactions noncontestable, providing Visa with additional leverage over merchants and acquirers.

95.     In response to the Federal Reserve's October 2022 clarification of the rules implementing the Durbin Amendment, referred to as Regulation II, Visa rushed to secure more volume under routing deals, to target merchant and acquirer deals with early termination fees for longer, firmer commitments of routing volume as well as to renew issuing agreements.  Visa then took steps to ensure volume was locked up prior to the regulation going into effect

### 4.  Visa Uses its Monopoly Powers to Obstruct Its Rivals from Gaining Scale

96.     There has been no significant entrant into the general purpose credit and charge card network services market since the 1980s.  Large and costly investments are necessary to build a network and develop the brand name to succeed as a payment network.  An entrant must also achieve scale on both sides of the merchant/acquirer and issuer/accountholder divide in order to compete effectively, which is very difficult to achieve. As the Southern District of New York has previously ruled, "there are significant barriers to entry in the general purpose card network services market." *United States v. Visa U.S.A., Inc.*, 163 F.Supp. 2d 322, 342 (S.D.N.Y. 2001).

The Antitrust Division of the Justice Department similarly concluded, as part of its settlement of antitrust litigation against Visa and MasterCard, that "[s]uccessful entry today would be difficult, time consuming, and expensive." Competitive Impact Statement, Proposed Final Judgment in *United States v. American Express Company et al.*, 7 (E.D.N.Y. Oct. 4, 2010).

97.     Visa's monopoly power in these markets is protected by substantial barriers to entry and expansion.  Visa's separate exclusionary contracts on both sides of this market widen the moat of power around its business and prevent any other debit network from gaining a meaningful share.

98.     Entrance into the signature debit network services business raises particularly acute problems.  Many merchants do not have PIN pads, and a widespread merchant acceptance network with signature authentication is particularly important for an issuer in order to provide the widest breadth of merchant acceptance for a debit card.  Moreover, unlike credit cards, where many cardholders carry more than one card, a debit card accesses the cardholder's deposit account and the vast majority of debit cardholders only carry one debit card.  If a merchant does not accept the debit card, it is unlikely a cardholder can pull out another debit card.  Therefore, successful entry of a signature debit network requires achieving widespread merchant acceptance comparable to Visa, which is very costly.

99.     On the merchant side of the business, Visa's monopoly power in debit network services reflects its overall dominant positioning as a signature debit network and its large share of signature debit network transactions.  If a merchant does not accept Visa signature debit cards, it is at risk of losing substantial sales to competitor merchants whenever PIN debit is a weak or nonexistent substitute.  Few, if any, merchants are willing to risk the substantial loss of retail sales to rival retailers if they stop accepting Visa signature debit cards.  The loss in retail profits from

not accepting Visa signature debit cards makes acceptance a "must have" for a large number of merchants.

100.    Visa uses its power to ensure control over non-contestable transactions and then leverages its control over those transactions to demand and enforce exclusivity.  To overcome Visa's scale advantage, a PIN network must not only compete on the merits for transactions it seeks to route, but also compensate the merchants, acquirers, and issuers for the cost of penalties imposed by Visa on all non-contestable transactions that the PIN network is not eligible to route.

101.    Visa has made it nearly impossible for PIN networks to win additional share. Despite the increased placement of PIN debit networks on the back of cards after the implementation of the Durbin Amendment and the PIN debit networks' development of new features to compete more closely with Visa and Mastercard, Visa has cut off PIN debit networks from gaining sufficient usage and acceptance on either side of the market to overcome network effects.  Collectively, the PIN networks represent approximately 11% of all debit transactions (and only 5% of card-not-present debit transactions).  No PIN debit network has more than a single-digit share of debit transactions in the United States.

102.    In the years since the Durbin Amendment, smaller networks have tried to win transactions from Visa by offering lower fees, innovating, and broadening their features. But the returns to these efforts were minimal, Visa used its immense size and large volume of non-contestable transactions to stifle these attempts at competition.

103.    Moreover, because networks need a critical mass of transaction data to reliably detect fraud, this lack of scale has prevented smaller networks from offering comparable fraud protections to the market leaders. PIN networks are unable to compete with the speed and accuracy

of Visa's fraud protection without this critical mass; as a result, Visa, by its own recognition, continues to win market share despite PIN networks' lower prices.

104.     These market dynamics allow Visa to take further anticompetitive steps to entrench its position. For instance, in 2023, issuers permitted less than half of total debit volume in the United States to be processed as card-present PINless transactions, which led many merchants not to enable such transactions. Visa believed an increase in card-present PINless enablement would benefit its competitors, and it feared that the enablement of card-present PINless by one large issuer could create a tipping point toward the widespread availability of such transactions. Accordingly, Visa acted to prevent such a tipping point from occurring.  JPMorgan Chase, which issued Visa-branded debit cards with Mastercard's Maestro as its back-of-card network, requested to add Discover's Pulse network in order to comply with Regulation II, in conflict with its contract with Visa prohibiting adding a second back-of-card network.

105.     At that time, Pulse—unlike Maestro—offered both card-present and card-not-present PINless functionality.  Visa worried that if Chase were permitted to add Pulse, it could create the tipping point for merchants and acquirers that could result in a substantial amount of merchant volume being enabled for PINless transaction Visa was concerned that a substantial amount of card-not-present transactions would be priced lower by PINless networks compared to Visa and would drive more merchants to adopt PINless networks, resulting in Visa losing transactions and having to lower its prices.  Visa allowed Chase only a short-term waiver to temporarily add Pulse, while requiring Chase to sign a new debit-routing agreement with Visa.

C. **Visa Uses Monopoly Power to Interfere with Innovative Alternatives Before They Are Able to Compete**

106.     Debit cards are no longer the sole method for consumers to pay merchants directly from their bank accounts.  Innovations by fintech companies have led to alternative debit networks

that store consumers' bank account numbers and credentials, allowing account holders to purchase directly from merchants that participate in their networks without the need for an intermediary traditional network like Visa. These innovations are also cheaper to use and easily implemented.

107.    Such innovations have already been adopted outside the United States. But these alternative debit competitors pose an existential threat to Visa's massive profits in the United States, and as such Visa has responded with a tireless campaign to use its market dominance to gatekeep and coopt these innovators, ultimately exacting concessions that prevent them from



challenging Visa's monopoly.

108.    Innovative competitors to Visa's debit network offer different types of payment solutions, such as digital wallets. Digital wallets are software-based systems offered online or through a smartphone app that store a consumer's payment credentials, including their bank account, debit cards, and credit cards, to fund consumer-to-merchant transactions. Well-known digital wallets include Apple Pay, Google Pay, Paypal, CashApp, and Venmo.

109.    Rather than out-compete with these innovators, or as in the case of its traditional rivals, attempt to box them out completely, Visa aims to partner with would-be competitors before

they can become disruptors. Despite the feasibility of these alternatives to successfully compete as mobile payments and online debit transactions rise significantly, they are instead incentivized to run through Visa's network in the United States.

110. Visa shares its monopoly profits with any technology company that could threaten Visa's role as the intermediary for both sides of debit transactions in exchange for protections against its removal as the dominant middleman. These include custom incentives programs through which Visa's largest and most important merchants exchange such protections against Visa's removal, non-disparagement, and future commitments for custom incentives. These are not routing deals, but straightforwardly horizontal product market division. In some cases, Visa gives away more incentives and makes less money on these deals than it would if it did nothing at all. But in the long term, Visa knows that these contracts solidify its position and continued monopoly profits.

### 1. FinTech Alternatives Would Pose an Existential Threat to Visa

111. Visa fears any displacement as an intermediary between both sides of a debit transaction. Since at least 2013, Visa has been aware and taking steps to mitigate disruption by fintech debit networks. A fintech debit network can facilitate consumer-to-merchant payments by providing end-to-end functionality equivalent to debit card networks by authorizing payments from a consumer's bank account, facilitating communications with the consumer's bank to clear the transaction, and providing settlement services by initiating a payment to the merchant's

financial institution.  These debit networks can also provide services such as payment guarantee for merchants, dispute resolution and chargeback services, and fraud protections.



112.    Digital wallets are financial transaction applications, usually stored in a smartphone or computer, that can be used to complete consumer-to-merchant transactions at more than one retailer using a stored payment credential. Digital wallets may enable consumers to pay for goods and services with funds in the wallet—these types of wallets are known as staged digital wallets or stored value wallets.  Staged digital wallets, as illustrated above, may use funds preloaded in the wallet or may pull funds into the wallet from a linked bank account (such as a checking account, using either a debit card or a bank account number) to make transactions. In the United States, PayPal and Square's Cash App operate as staged digital wallets.

## How does a digital wallet work?



113.    A second type of digital wallet, called a pass-through wallet, transmits a consumer's payment credentials (such as a debit card account number) directly to a merchant's acquirer, which then uses those credentials to process the payment in a manner similar to a traditional debit transaction (illustrated above).  Apple Pay and Google Pay are two popular examples of pass-through digital wallets.

114.    Availability of alternative payment rails that move money in real time have increased, and a growing number of fintech firms are able to build upon these payment rails to compete with Visa, particularly Visa's lucrative card-not-present debit business.  Other participants in the payments ecosystem, such as payment processors, banks, and firms that have the ability to build the necessary connections between consumer bank accounts and merchants, also have the capability to offer fintech debit network services.  These fintech companies could launch debit networks that compete with Visa by displacing card-based funding options with payments directly from consumers' bank accounts.  And, these new, non-card-based payment rails are cheaper alternatives to Visa's payment rails.

115.    For decades, payment networks have facilitated bank transfers via ACH, an interbank payment service which took several days to settle payment and even longer to make

funds available in a consumer's bank account. However, new alternatives have developed. Innovative fintech firms have sought to build new capabilities on ACH and even new infrastructure that provides a faster alternative to ACH (known as realtime payments or RTP). For example, The Clearing House launched RTP Network, a real-time payments network that allows immediate clearance and settlement of transactions, and the Federal Reserve launched FedNow in 2023 to provide instant payment services between depository institutions. As faster payment alternatives emerge and banks begin to connect to them, they create the opportunity for making funds available in as close to real time as possible.

116.    And yet, few digital wallets or other potential fintech debit networks have incorporated these new real-time payments networks. Visa is particularly concerned with potential competitors that have relationships with both accountholders and merchants, because these companies are positioned to build the scale necessary to succeed as a payment platform. Visa knew that tech companies like PayPal, Apple, and Square had acceptance at millions of merchants and relationships with over one hundred million accountholders in the United States. Like traditional debit networks, fintech debit networks require both consumer and merchant participation. Consumers enroll in the fintech company's network, including going through the steps to link their bank accounts. Merchants also enroll in the service.

117.    Visa has consistently viewed Apple as a threat, in large part due to its broad merchant acceptance and broad base of Apple Pay users. Visa feared that Apple on its own, or in partnership with another entity, could build its own payment network independent of Visa's rails. Visa was aware that Apple had approached a large debit issuer about building a network without Visa or Mastercard and understood that it needed to act to prevent any disruption of its dominant position.

### 2. Visa Wielded Its Debit Monopoly to Prevent that Existential Threat from Becoming Reality

118.    PayPal had brief success disrupting Visa's stranglehold on the network between consumers and merchants.  But in 2016, Visa cut off any future competition by entering in to a deal with PayPal that is representative of how it would handle future competition by other digital wallets.  Resorting to its classic carrot and stick playbook, Visa threatened high fees and dangled big payoffs to move PayPal transaction volume back to Visa's rails and stop PayPal from competing aggressively against Visa.

119.    The first version of the PayPal electronic payments system was launched in 1999. eBay acquired the company on October 3, 2002, and more than 70 percent of all eBay auctions accepted PayPal payments, and roughly 1 in 4 closed auction listings were transacted via PayPal. PayPal became the default payment method used by the majority of eBay users, and soon expanded when, in 2007, PayPal announced a partnership with MasterCard, which led to the development and launch of the PayPal Secure Card service, a software that allowed customers to make payments on websites that do not accept PayPal directly.

120.    Many merchants started accepting PayPal as part of their expansion into e-commerce.  PayPal offered a staged digital wallet with an alternative debit credential—accountholders loaded funds into their PayPal wallet using their bank credentials and could make purchases using ACH. ACH transactions from PayPal's wallet included many of the same features as debit, such as fraud detection, fund guarantees, and the ability to dispute a transaction.

121.    Some of PayPal's customers used their Visa debit cards to pay for transactions at these merchants, including many online small- and mid-sized businesses.  As a result, PayPal brought significant incremental volume to Visa, which Visa initially supported.  But in 2015, when PayPal was spun-off from its parent company, eBay, Visa became concerned about PayPal's scale

and its move to encourage PayPal users to pay directly for goods and services with their bank accounts rather than with their debit or credit cards.

122.    Leveraging the number of customers that still made payments through PayPal using their Visa debit cards, Visa used the threat of exorbitant wallet fees and high rack rates on those transactions to induce PayPal to enter into a new, expansive routing contract.  As with other merchants, PayPal could not risk losing the customers who used Visa on its platform if it told them they could no longer used their cards.

123.    Visa's expansive deal with PayPal imposed a restriction on ACH funding transactions when the PayPal customer had an existing Visa card in their PayPal wallet.  While Visa relaxed its restrictions in 2021, Visa mandated information sharing so that it could monitor PayPal's product success and to this day restricts PayPal's in-store ACH funding transactions to a QR code model whereby a consumer must scan a merchant's QR code before connecting to PayPal to complete a transaction. Visa's continued restrictions on PayPal add frictions that limit the use of PayPal as an in-store alternative to Visa.

124.    In 2022, PayPal and Visa entered into a new 10-year contract that limits PayPal's incentives and ability to disrupt the debit market. This includes a debit routing commitment of 100% of its Visa-eligible volume from years four to ten, penalties for failing to convert its co-branded debit cards to Visa, a requirement to participate in certain Visa programs and services, and preservation of most of Visa's "customer choice" provisions, which preference Visa payment methods over other competitive alternatives.  Visa's continued dominance of the debit market and the looming threat of Visa's exorbitant wallet fees and rack rates continues to leave PayPal with no viable alternatives.

125.    Since 2016, Visa has threatened the same fees and punishments on staged digital wallets  on other entities, but all have signed deals with Visa rather than pay it. Visa waives the fee if the wallets agree not to compete.  Otherwise, they are subject to pay substantial targeted fees that make the alternative networks far less profitable to operate.

126.    Similarly, Visa has entered into a series of prohibitive contracts with Block, Inc. (formerly Square), the provider of Cash App (formerly Square Cash), that have foreclosed Block from competing aggressively against Visa and prevented Block from developing viable alternative debit networks for consumer-to-merchant payments.

127.    Block's inaugural product Square, launched in 2009, is a point-of-sale system designed for small and medium sized businesses.  It allows businesses to accept card payments and manage various operations.  In 2013, Cash App was launched to enable peer-to-peer payment services.  In October 2014, the company launched the integration of a payroll feature into its Square payment processing system, following the integrations of a merchant cash advance offering, a customer feedback product and an invoicing service into the system.  Block sought to avoid additional Visa fees for Cash App so that it could facilitate such payments using debit cards. Visa worried that if it did not sign a contract with Block, it would build in an ACH routing option that would enable direct payments using bank account credentials to launch a new consumer-to-merchant debit product.

128.    Visa chose to participate in Cash App and offered not to charge high rack rates for transactions using Visa's debit network, but Visa required that it have the right to terminate for convenience, in case Block started to compete with Visa.  Visa believed it got two main benefits from the deal— the debit routing commitment; and protection for its status as middleman.

129.    When Block announced a new product, called "Cash Drawer," in 2016, Visa again acted quickly to neutralize any threat. Like PayPal and its peer-to-peer platform Venmo, Cash Drawer permitted users to store funds in their account.  Visa sent a letter of intent to terminate its contract with Block, informing the company that Cash Drawer was a problem because Visa viewed a staged wallet as opposed to the model that Visa and Square had worked together on. In response, Square quickly removed the feature, rather than face the possibility of higher fees and penalties on Visa debit transactions, and Visa did not terminate the contract.

130.    Next, in 2021, Square launched Cash App Pay to enable customers to purchase directly from merchants with Cash App. Because Cash App Pay would have triggered Visa's staged wallet fees, Square asked Visa to waive the fees. Visa recognized that Cash App Pay could threaten disintermediation, but also that Visa could threaten fees to provide leverage in a negotiation. In 2023, Visa used this leverage to enter into an agreement with Square to send 97% of Cash App Pay transactions over Visa's rails.  The agreement additionally provided that Cash App Pay would preference Visa in its signup process and would not steer customers to ACH.

### 3.  Visa Pays Potential Competitors Hundreds of Millions Not to Compete

131.    Visa spends millions of dollars on creating and maintaining relationships with Big Tech companies to cut off competition before it begins, maintaining control of ecommerce acceptance and online payments.  Many of Visa's potential competitors are also Visa customers. Visa uses its monopoly power, and the threat of imposing its high fees, rack rates, and other penalties, to induce potential competitors to sign contracts that preserve Visa's prime position in the payments ecosystem.

132.    With a portion of its ill-gotten profits, Visa targets a small number of Visa's largest and most influential Big Tech merchants with custom incentive arrangements on Visa-eligible

debit volume in return for commitments from them to not dislodge Visa as the middleman, and other future commitments. These contracts amount to a horizontal product market division, in which the deals are not profitable absent an impact on competition.

133. For example, Visa has deals with Apple in which Apple agrees that it may not develop or deploy payment functionality with the aim of competing with Visa, such as creating payment functionality that relies primarily on non-Visa payment processes or payment products. Apple is also barred from providing incentives that would draw customers away from Visa. In return, Visa shares its monopoly profits with Apple. Visa has also provided Apple with reduced merchant fees in exchange for Apple's commitment not to create new payment technologies that would disrupt Visa's network, power, or customer base. When Visa first entered into its contract with Apple in 2012, it predicated it on the right to terminate if there was competition by Apple. Visa continues to condition its participation on Apple maintaining its status as a non-competitor, while aligning incentives with Apple as much as possible. Visa payments to Apple amounted to hundreds of millions of dollars in 2023, and reflect Visa's commitment to insulating its dominance, rather than risk a competitive market.

**D.  Key Players at Visa Enforced the Monopoly**

134. Each of the anticompetitive practices described above were deliberately and diligently part of Visa's strategy to maintain its monopoly control on the debit network market. Each of the Visa executives described below are only some of the key players that kept this exclusionary conduct in effect, and each of them, on information and belief, live in California, where this conduct was carried out.

135. Ryan McInerney is the current Chief Executive Officer of Visa as of February 2023. Prior to this role, he was President, responsible for Visa's global businesses. He has overseen the company's market teams, business units, product team, merchant team, and client services, and

according to past CEO Al Kelly, who mentored him directly, "has become intimately familiar with how Visa operates:"[1]  Under McInerney's leadership, Visa is continuing its anticompetitive practices and has strengthened and renewed its exclusionary contracts with major merchants and issuers.

136.    Michael Chall is the current Head of Business Development, Global Technology Partnerships, a role he has held since March 2011.  In this position, Chall is responsible for creating strategic partnerships with leading global players in the payment ecosystem, including analyzing the competitive landscape, supporting pricing, terms, and contractual negotiations with large accounts and business partners, and developing leads on new acquirer processing products and services.

137.    Sophie Decker is the current Head of Global Sales Enablement and Analytics, Merchant Sales and Acquiring, a role she has held since 2019.  Prior to this role she was Vice President of Merchant Strategy and Sales Effectiveness and Vice President of Business Planning and Operations, each part of her nearly 20-year tenure with Visa.  In these roles, Decker creates recommendations to the largest merchants and acquirers in the world, developed strategy plans and best practices to track and expand Visa acceptance in new merchant segments and markets globally, and managed Visa's product capital investment portfolio.

---

[1] "Visa Announces Leadership Transition" Visa, November 17, 2022.
https://investor.visa.com/news/news-details/2022/Visa-Announces-Leadership-Transition/default.aspx

138.   Prabhu Vasant was Visa's Chief Financial Officer for eight years prior to his departure from Visa on September 30, 2023.  Prabhu is credited with leading Visa to expand new payment flows and navigate the evolving regulatory environment post-Durbin.  As Vice Chairman from 2019, Prabhu additionally provided strategic counsel on major initiatives and geographies important to Visa's future growth.  Below is a graph reflecting the performance of Visa shares during Prabhu's tenure, and the strengthening of anticompetitive contracts that enabled such



# Performance of Visa shares during Vasant Prabhu's tenure

By: Manya Saini
Source: Refinitiv Datastream
Reuters Graphics

growth.

## VII.   ANTICOMPETITIVE EFFECTS

139.   For decades, Visa has been able to maintain its dominant position in the market through actions that harm competition.  By enforcing exclusionary and anticompetitive contract terms, its control over currently non-contestable transactions both excludes competition for those

transactions that can—and should—be contested and insulates those currently non-contestable transactions from competition in the future.

140.    But-for Visa's exclusionary and anticompetitive contracts with merchants, acquirers, and issuers, and other industry participants, Visa's back-of-card competitors (i.e., PIN networks, including Mastercard's Maestro), would have the chance to gain the scale needed to compete effectively with Visa and offer banks and merchants real choices.   But-for Visa's exclusionary and anticompetitive contracts with potential fintech rivals, those would-be competitors would have greater incentive to innovate and compete more directly with Visa—and Visa would have more incentive to respond—offering consumers and businesses new choices and better features.   Thus, but-for Visa's anticompetitive and exclusionary conduct, competition from current and potential rivals would increase competition and likely lead to lower fees, better service, and greater innovation.

141.    Visa's exclusionary and anticompetitive conduct ensures that rivals cannot compete or gain scale, a competitive process that should benefit other market participants, including issuers, acquirers, merchants, and consumers. Visa's conduct prevents its rivals from being enabled on both the consumer (issuer) and merchant (acquirer) sides of the debit networks at a scale to compete effectively with Visa.

142.    Visa's success in its anticompetitive endeavors is both facilitated and reflected by the substantial foreclosure of competition it has achieved in the relevant markets.   It is three times larger than its next biggest rival, while all other rivals fight for single-digit shares of the debit network markets.

143.    Visa's exclusionary and anticompetitive conduct creates a vicious cycle that further insulates it from competition.   Through agreements that constrain competition on both sides of the

market, Visa has deprived rivals of the scale they need to offer effective competition now and in the future.  Rival networks have limited or no ability to compete on price and quality, nor the ability to amass the scale they would need to provide those competitive products.  Visa's exclusionary agreements with issuers, merchants, and acquirers limit how much additional volume rival networks can win even if they lower prices or invest in new benefits or features.  This reduces the benefits to PIN networks of cutting prices or investing in new benefits and innovative features.

144.    Weakening its rivals in these ways not only protects Visa from competition for transactions that should be subject to competition today, but also reduces the chances that those rivals can offer the features and services necessary to erode Visa's advantage on non-contestable transactions later, such as further development of PINless routing.

145.    Visa's exclusionary and anticompetitive conduct has inhibited other beneficial innovation.  Since the early 2000s, Visa has successfully delayed or detered the development of fintech network services that would offer Americans new ways to pay merchants directly from their bank accounts.  This has likely delayed or deterred the introduction of features such as staged digital wallets, store-credit or discount offers in digital wallets, or other features that would increase convenience and security and build closer relationships between merchants and consumers.  Visa's efforts have not only reduced innovation from other companies that would benefit consumers and businesses today, but also its own incentives to innovate in competition with these incipient rivals.

146.    Vigorous competition should limit Visa's prices and prompt investment in innovation and benefits for its customers and American consumers.  But Visa has sought to avoid competition of any kind.  Visa insulates its debit transaction volume and status as dominant middleman from competition whenever it can; sometimes by foreclosing rivals from being able to

meaningfully compete for significant shares of the market and sometimes by reducing incentives to compete via imposing fees or providing financial benefits.  Visa's conduct further suppresses incentives of current and potential rivals—as well as its own incentives—to compete and innovate.

147.    Robust competition should control whether and how issuers, acquirers, merchants, and consumers interact with each other—not Visa.  Nor should Visa set the fees that those issuers, acquirers, merchants, and consumers pay directly or indirectly to debit networks.  Nor should Visa set the pace of innovation—from both rivals and Visa itself—of features and services that benefit consumers, merchants, acquirers, and issuers in the markets for debit transactions.

148.    Visa has captured a substantial volume of contestable transactions through anticompetitive means, preserved or expanded the pool of non-contestable transactions, blocked or discouraged competitive threats from current or would-be rivals, and benefited from the monopoly that results.  PIN networks' attempts to compete with Visa following the Durbin Amendment have only seen short-lived gains, as Visa repeatedly leveraged its massive scale and immense volume of non-contestable transactions to penalize disloyalty from merchants, acquirers, and issuers, at the expense of competitors, consumers, merchants, and other market participants. Visa, by its own recognition, continues to win despite PIN networks generally offering lower prices.

## VIII.   NO COUNTERVAILING FACTORS

149.    There are no valid, procompetitive benefits to Visa's exclusionary conduct that outweigh its anticompetitive effects or cannot be obtained through less restrictive means. Visa's anticompetitive contract terms and related conduct are not reasonably necessary to protect Visa's technology, incentivize customer growth, prevent free riding, or achieve any other claimed benefit. Visa can achieve any legitimate, procompetitive objectives without imposing the anticompetitive terms challenged in this case, or those benefits could be achieved through less restrictive means.

Moreover, Visa's agreements with current and potential direct competitors are not ancillary to its vertical relationship. Rather, they are divisions of the relevant markets by direct competitors.

## IX.    RELEVANT DEBIT MARKETS

150.    Courts define a relevant market, which has both a geographic and product market dimension, to help identify the lines of commerce and areas of competition impacted by alleged anticompetitive conduct. There can be multiple relevant markets covering the same or similar products and services and markets need not have precise metes and bounds.

151.    There are two relevant markets for purposes of identifying Visa's unlawful, exclusionary conduct. General purpose debit network services in the United States is a relevant market. General purpose card-not-present debit network services in the United States is also a relevant market, one that is narrower and included within the market for general purpose debit network services in the United States.

152.    These markets include transactions made by two classes of Plaintiffs: (a) consumers who acquire and use a Visa debit card at Visa accepting merchants and (b) merchants who accept Visa debit cards for purchases of goods or services.

### A.    **Geographic Market**

153.    The United States is a relevant geographic market. Federal laws and regulations that govern debit transactions, including card-not-present transactions, operate at the national level.  Visa organizes its U.S. debit business at the national level, as demonstrated by its separate rules governing merchant acceptance in the United States and its separate pricing of debit, including card-not-present debit, to merchants, acquirers, and issuers in the United States.  The relevant parties to a debit transaction—consumers, issuers, acquirers, and merchants—could not practicably turn to debit network services offered elsewhere as alternatives.  Therefore, a firm that was the only seller of general purpose debit network services or general purpose card-not-present

debit network services in the United States would be able to maintain prices above the level that would prevail in a competitive market.

154.    It has previously been found that the United States is the relevant geographic market for the general purpose credit and charge card network services market.  *U.S. v. Visa U.S.A., Inc*., 163 F.Supp. 2d 322, 340-341 (S.D.N.Y. 2001).

### B. <u>Relevant Product Markets</u>

155.    There are two relevant product markets: (1) general purpose debit network services; and (2) general purpose card-not-present debit network services. These markets cover transactions made by consumers using Visa debit cards and merchants accepting Visa debit cards for purchases.

### 1. General Purpose Debit Network Services

156.    General purpose debit network services are payment products and services that facilitate the debit (i.e., withdrawal) of funds directly out of a consumer's bank account, often using a credential or other account number to identify the consumer. Visa and its debit card network and fintech debit competitors provide products and services that are inputs to and that enable debit transactions. They compete to provide debit network services for general purposes, meaning that their debit credentials are accepted at numerous, unrelated merchants.  These networks sell services simultaneously to both issuers and acquirers, or, in the case of some alternative debit networks, accountholders and merchants. They serve as intermediaries between accountholders and merchants, operating two-sided transaction platforms that facilitate transactions between merchants and accountholders from their respective bank accounts. These services that Visa and its debit network competitors enable constitute a relevant product market.

157.    Debit networks, like Visa, provide a variety of services that enable a debit transaction, and this suite of services constitutes a product that is jointly consumed by merchants and accountholders (as well as the acquirers and the issuers). These services include the ability for

the consumer or her bank to dispute and chargeback the transaction; payment guarantees for merchants; fraud protections for all parties; as well as the "rail" or methods in which the other parties communicate among each other to facilitate the transaction and transfer funds from the consumer's bank account to the merchant's account. These minimum attributes of debit are important to merchants, consumers, and banks alike and distinguish debit from other methods of payment. Although accountholders do not contract directly with Visa, the accountholders and their banks rely on Visa and other networks to make possible purchases from merchants.

158.    Debit networks are two-sided platforms that exhibit a high degree of interdependency between accountholders and issuers on the one side and merchants and acquirers on the other.  Accountholders and issuers get more value from a network that connects to more merchants, and merchants and acquirers get more value from a network that connects to more accountholders.

159.    General purpose debit network services constitute a relevant product market under the antitrust laws. Many consumers would not find other payment services to be a suitable substitute for debit. Issuers, knowing that many of their accountholders value debit, do not consider alternative payment services to be a suitable substitute for debit. Merchants do not consider other payment services to be a substitute for debit because they do not want to risk lost sales by not accepting many consumers' preferred payment method. Acquirers, knowing that their merchants value debit, do not view alternative payment services to be a suitable substitute for debit. Thus, there are no reasonable substitutes for general purpose debit network services, and a firm that was the only seller of services to facilitate debit transactions would be able to maintain prices above the level that would prevail in a competitive market.

160.    The market for general purpose debit network services includes services sold by debit networks other than traditional debit card networks. Fintech debit networks can be accepted at all merchants that participate in the network and provide payment guarantees, dispute resolution and chargeback capabilities, and fraud protection services. In a debit transaction processed by a fintech network, the consumer does not have a "debit card" and there is no "issuer" of a physical or virtual debit card, however, the services provided by fintech debit networks provide the same functionality to consumers and merchants.

161.    General purpose credit card network services are not reasonably interchangeable with debit network services because debit payments draw from funds already in a consumer's bank account, rather than from a line of credit. Visa describes debit as a "pay now" product and credit as a "pay later" product. The distinction between credit and debit is widely accepted in the payments industry. Visa and other card networks have different pricing for debit and credit transactions, and the Durbin Amendment's limitations of issuer transaction fees does not apply to credit. Many accountholders do not qualify for credit cards or have a strong preference for paying out of their existing funds rather than taking on debt to make purchases using a line of credit. Given many account holders' strong preference for debit, issuers cannot substitute from debit to credit.

162.    Network services for store cards and other prepaid cards are not reasonably interchangeable with debit network services. Rather, Visa sees prepaid cards as "complements" to its other card products. Prepaid cards are not connected to a consumer's bank account, so only funds that have been loaded on the card in advance can be spent. For that reason, Visa refers to prepaid as a "pay before" product, while debit is a "pay now" product. Visa also prices prepaid card network services differently to merchants, acquirers, and issuers than debit cards.

163.    Payments made through basic ACH transfers offered by The Clearing House or the Federal Reserve are often used for disbursements, paychecks, interbank settlements, and recurring fixed payments like mortgage and tuition payments. A basic ACH transfer is not reasonably interchangeable for most debit transactions. Absent services created by fintech firms and other payment networks, basic ACH transfers are inconvenient for consumers because they require a burdensome onboarding process in which the consumer must enter his bank account and routing information for each merchant, and then take steps to verify his account, which requires additional input and can take several hours or even days. ACH transfers are inconvenient for merchants because it can take two to three days to determine whether a payment is successful, and such transfers are more subject to fraud. Basic ACH transfers also lack the guarantee of payment for merchants and the dispute resolution and chargeback capabilities for consumers that debit offers. Newer interbank instant payment services, such as the Federal Reserve's FedNow and The Clearing House's RTP, may provide faster payment transfers in the future, but they would require the same additional services from a fintech or other payment network, such as fraud detection, dispute resolution, and chargeback services, to become a viable alternative to debit.

164.    Cash and check payments are not reasonably interchangeable for debit network services. Merchants and accountholders do not view cash and check transactions as reasonably interchangeable with debit transactions. The procedures and costs for accepting and processing cash and check payments differ widely from those for accepting and processing payments directly from the accountholder's bank.

## 2.  General Purpose Card-Not-Present Debit Network Services

165.    General purpose network services for all debit transactions, where debit credentials are accepted at numerous, unrelated merchants, constitute a relevant market; however, industry

participants, including Visa, also categorize debit network services in narrower markets that are best understood as submarkets of the larger market for debit network services. General purpose card-not-present debit network services are a narrower relevant product market included within the broader general purpose debit network services market. Card-not-present debit network services are primarily utilized for e-commerce transactions.

166.    The general purpose card-not-present debit network services market includes both traditional debit card transactions and fintech debit transactions. Both enable consumers to pay for goods and services at numerous, unrelated merchants directly from the funds in their bank accounts.

167.    General purpose card-not-present debit network services constitutes a relevant product market under the antitrust laws. Few consumers, issuers, merchants, or acquirers would find other payment services to be a suitable substitute for card-not-present debit. In the card-not-present channel, there are even fewer viable forms of payment (for example, cash is not an option) than in the broader general purpose debit network services market. Thus, there are no reasonable substitutes for card-not-present debit, and a firm that was the only seller of general purpose card-not-present debit network services would be able to maintain prices above the level that would prevail in a competitive market.

## X.    VISA HAS MONOPOLY POWER IN THE RELEVANT MARKETS

168.    Visa has monopoly power in the general purpose debit network services and general purpose card-not-present debit network services markets in the United States.  Visa's market shares exceed 60% and 65%, respectively, based on payment volume.  Mastercard, the second-largest debit network in the country, processes less than 25% of debit transactions in either of these markets.  No other competitor holds more than a single-digit percentage of transactions in these markets.

169.     Visa's monopoly power in the relevant debit markets is a product of its power to manipulate prices and suppress competition.

170.     Visa 's exceptionally high profit margins reflect its maintenance of monopoly prices.  Visa's operating margin in North America is 83%, with the U.S. debit business being its largest contributor. These margins far exceed the high global margins that Visa has reported since it went public in 2007, and are also substantially higher than most other publicly traded companies.

171.     Visa has successfully excluded competition in both markets, as demonstrated by its consistently high market shares that have remained intact despite regulatory shifts.  In preparation for the Durbin Amendment, Visa started signing contracts with merchants and acquirers, ensuring that almost all of their Visa eligible debit volume was routed to Visa.  Immediately after the Durbin Amendment was implemented in 2012, Visa's share dropped from approximately 63% of debit payment volume in 2011 to approximately 56% in 2012.  But within a few years, Visa not only recovered its former market share but further strengthened its debit monopoly.  Visa's shares have only increased over the last decade.  Visa has since continued to use similar tactics whenever faced with threats to its market dominance.

172.     Similarly, even with the recent clarification under Regulation II requiring issuers to enable at least one network unaffiliated with the front-of-card network for card-not-present transactions, Visa's market shares remain unaffected.

173.     Several additional factors beyond high profit margins and sustained market share confirm Visa's monopoly power.

174.     Unlike smaller PIN networks, Visa and Mastercard are accepted by virtually every U.S. merchant that processes debit payments, regardless of whether the majority of their revenue comes from card-present or card-not-present transactions.  Merchants consider both Visa and

Mastercard indispensable, accepting both networks to maximize sales opportunities. This feature of the market for debit transactions gives Visa considerable leverage over merchants. Unlike more competitive markets, merchants cannot decline to contract with Visa when faced with price hikes or unfavorable terms. Further, any competitor debit networks face obstacles to market entry and growth, such as dual-sided scale issues and brand recognition.

175.    Merchants and acquirers are more likely to accept the costs of enabling and complying with networks that have sufficient volume to justify the expense and effort. Similarly, issuers are more likely to enable networks widely accepted by merchants. Visa recognizes that its smaller rivals lack scale—wide enablement by issuers and acceptance by merchants. The market's two-sided nature creates a feedback loop known as network effects, whereby it is difficult to win widespread enablement without widespread acceptance, and vice-versa. This need for scale poses a significant barrier to both market entry and expansion.

176.    Banks generally issue debit cards associated with only one front-of-card network, typically signing long-term agreements with either Visa or Mastercard and rarely switching between the two due to the costs and consumer disruption involved. These switching costs further entrench Visa's dominance, limiting Mastercard's growth and hindering potential front-of-card competitors from entering or expanding in the market.

177.    Visa understands and actively exploits these barriers, including switching costs and network effects, to prevent rival networks and potential competitors from disrupting its dominance in U.S. debit markets. In 2023, Visa warned issuers they could face monetary penalties if they enabled new features from competing PIN networks that would reduce Visa's debit network volume. At that time, new Federal Reserve regulations required issuers to support at least two unaffiliated networks for card-not-present transactions. Prior to these regulations, many issuers

relied solely on front-of-card networks—either Visa or Mastercard—to process these transactions. The new regulations could have meant that merchants and acquirers would finally enable competitor network's PINless capabilities. But because the Federal Reserve's requirement applied only to card-not-present transactions, Visa began encouraging issuers to *turn off* PINless capabilities for card- present debit transactions, thereby slowing the enablement of PINless capabilities by merchants and acquirers. Among the approved talking points was a reminder that enabling card-present PINless may result in the issuing partner paying higher fees and other penalties. These penalties would serve as a price increase to issuers, one which they could not easily avoid due to the costs of switching networks. Visa's actions to encourage disabling card-present PINless helps Visa increase its set of non-contestable transactions, which it utilizes to create penalties for disloyalty.

178.    Visa's monopoly power enables it to set prices without regard to actual costs. Visa also engages in price discrimination across different industry groups, with such pricing differences unrelated to the costs of providing services.

179.    Visa has also imposed new, unfavorable pricing structures without losing debit volume. In 2012, Visa implemented its monthly Fixed Acquirer Network Fee (FANF) across all merchants and acquirers without losing debit volume. In October 2023, Visa implemented a mandatory Digital Commerce Service fee, which bundled several previously optional services fees charged to card-not-present transactions. Visa anticipates nearly five times the net revenue from this new mandatory fee compared to the previously optional fees. Despite imposing this new charge on merchants through their acquirers, Visa knew it would not lose transactions, and continues to set fees based on its own perception of value, rather than costs or competition.

## XI.     CLASS ALLEGATIONS

180.     Plaintiff NUTS FOR CANDY brings this action on behalf of itself and all other similarly situated businesses pursuant to Rule 23 of the Federal Rules of Civil Procedure as representative of a class defined as follows:

All merchants in the United States that accepted Visa Debit Cards[2] during the period from October 1, 2020, through the present.

181.     Plaintiff CATHY HOUTS brings this action on behalf of herself and all other similarly situated persons pursuant to Rule 23 of the Federal Rules of Civil Procedure as representative of a class defined as follows:

All natural persons and entities in California, and other states that allow indirect purchaser damage actions, who purchased goods or services from a merchant that accepted Visa Debit Cards[3] during the period from October 1, 2020, through the present.

---

[2] Visa Debit Card" means any Debit Card that bears or uses the name Visa, Plus, Interlink, or any other brand name or mark owned or licensed for use by Visa, or that is issued under any such brand or mark. "Debit Card" means any card, plate, or other payment code, device, credential, account, or service, even where no physical card is issued and the code, device, credential, account, or service is used for only one transaction or multiple transactions—including, without limitation, a plastic card, a mobile telephone or other mobile communications device, a fob, a home assistant or other internet-connected device, or any other current or future code, device, credential, account, or service by which a person, business, or other entity can pay for goods or services — that is issued or approved for use through a payment network to debit an asset or deposit account, or that otherwise is not a Credit Card, regardless of whether authentication is based on signature, personal identification number (or PIN), or other means (or no means at all), and regardless of whether or not the issuer holds the account (such as decoupled debit).

[3] Visa Debit Card" means any Debit Card that bears or uses the name Visa, Plus, Interlink, or any other brand name or mark owned or licensed for use by Visa, or that is issued under any such brand or mark. "Debit Card" means any card, plate, or other payment code, device, credential, account, or service, even where no physical card is issued and the code, device, credential, account, or service is used for only one transaction or multiple transactions—including, without limitation, a plastic card, a mobile telephone or other mobile communications device, a fob, a home assistant or other internet-connected device, or any other current or future code, device, credential, account, or service by which a person, business, or other entity can pay for goods or services — that is issued or approved for use through a payment network to debit an asset or

182.    Excluded from the above-proposed classes are Visa; Visa's affiliates and subsidiaries; current or former employees, officers, directors, agents and representatives; the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediately family members; counsel to Plaintiffs and the proposed classes, as well as counsel's employees; and all governmental entities.

183.    On information and belief, hundreds of thousands of entities in the United States have contracted with Visa acquirers to accept Visa-branded debit cards during the relevant period, and millions of consumers made purchases at these merchants.  Thus, the class is so numerous and geographically dispersed that joinder is impracticable.

184.    Plaintiffs' claims are typical of the class.

185.    Plaintiffs and all members of the class suffered the same injuries—inflated prices—as a result of Visa's conduct.

186.    Plaintiffs will fairly and adequately protect and represent the interests of the class. Plaintiff's interests are not antagonistic to the class.

187.    Plaintiffs are represented by counsel who are competent and experienced in the prosecution of complex class action antitrust litigation.

188.    Questions of law and fact that are common to the members of the class predominate over questions, if any, that may affect only individual members because Visa has acted and refused to act on grounds generally applicable to the entire class.  Such generally applicable conduct is inherent in Visa's exclusionary and anticompetitive conduct, as more fully alleged herein.

189.    Questions of law and fact common to the class include:

---

deposit account, or that otherwise is not a Credit Card, regardless of whether authentication is based on signature, personal identification number (or PIN), or other means (or no means at all), and regardless of whether or not the issuer holds the account (such as decoupled debit).

a.     Whether Plaintiffs and class members have been charged inflated prices and thus damaged as a result of Visa's unlawful and monopolistic behavior;

b.     Whether Visa had a monopoly in the relevant market;

c.     Whether Visa's actions were done for procompetitive reasons;

d.     The effects of Visa's anticompetitive conduct on network fees, interchange fees, and retail prices;

e.     Whether Visa maintained or increased monopoly power in the relevant market;

f.     Whether Visa engaged in anticompetitive conduct in order to undercut competitors and block competition to maintain monopoly power in the relevant market;

g.     Whether Visa intentionally and unlawfully impaired or impeded competition in the relevant market; and

h.     The proper measure of damages.

190.    Class action treatment is a superior method for the fair and efficient adjudication of this controversy in that such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would entail. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

191.    Plaintiffs know of no difficulty to be encountered in the maintenance of this action as a class action.

## XII.   CONTINUING VIOLATION

192.    Plaintiffs' claims are timely under the continuing violations doctrine. Visa's anticompetitive and unlawful conduct has continued within the applicable limitations period. Visa has taken acts during the Class Period to maintain and attempt to maintain its monopoly, including negotiating volume commitment agreements that prevent merchants and acquirers from routing debit transactions away from Visa. Visa has also entered into anticompetitive agreements with competitors or would-be competitors during the Class Period.

193.    As a result of Visa's anticompetitive conduct, throughout the Class Period and until the present, Visa imposed higher fees on Class Members than it would have been able to in a competitive market.  Each debit transaction routed through Visa thus constituted a new overt act causing injury to the Class.  Visa's unlawful conduct continues to this day.

194.    Plaintiffs and the Class may recover damages suffered because of Visa's conduct during the Class Period.

## XIII.  CAUSES OF ACTION

### A.  <u>Count One: Monopolization of the Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in the United States in Violation of Sherman Act § 2</u>

195.    Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

196.    Visa has monopolized, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services; and (2) the market for general purpose debit network services.

197.     Visa has monopoly power in both relevant markets.

198.    Visa has willfully and unlawfully maintained its monopoly in each relevant market through the exclusionary course of conduct and anticompetitive acts described herein.

199.    While each of Visa's acts is anticompetitive in its own right, Visa's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process in each relevant market, including, as compared to a more competitive environment, raising barriers to competition by other current and potential competitors, imposing supracompetitive prices, stabilizing prices, depressing price competition, restricting output or other services, and slowing innovation.

200.    Visa's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Visa's anticompetitive and unlawful conduct.

201.    Plaintiffs and other members of the Class have been injured by paying more for goods and services from merchants that accept Visa Debit Cards than they would have in the absence of Visa's conduct.

**B.    Count Two: Attempted Monopolization of the Markets for General Purpose Debit Network Services and General Purpose Debit Card-Not-Present Debit Network Services in the United States in Violation of Sherman Act § 2**

202.    Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

203.    Visa has attempted to monopolize, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services; and (2) the market for general purpose debit network services.

204.    Visa has monopoly power, or alternatively has a dangerous probability of obtaining monopoly power, in both relevant markets.

205.     Visa has attempted to monopolize each relevant market through an exclusionary course of conduct and anticompetitive acts described herein. While each of Visa's acts is anticompetitive in its own right, Visa's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process in each relevant market, including, as compared to a more competitive environment, raising barriers to competition by other current and potential competitors, imposing supracompetitive prices, stabilizing prices, depressing price competition, restricting output or other services and slowing innovation.

206.     Visa's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Visa's anticompetitive and unlawful conduct.

207.     Plaintiffs and other members of the Class have been injured by paying more for goods and services from merchants that accept Visa Debit Cards than they would have in the absence of Visa's conduct.

### C.  Unlawful Agreements Not to Compete in Violation of Sherman Act § 1

208.     Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

209.     Visa's agreements with competitors and potential competitors not to compete unreasonably restrain competition, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services; and (2) the market for general purpose debit network services.

210.     Visa has market power in both relevant markets.

211.    Visa's agreements pay competitors not to compete in each relevant market and pay potential competitors not to develop alternatives to debit card networks or adopt new technologies that may disintermediate traditional debit card networks. These agreements reduce or eliminate competition from existing or potential rivals who would challenge Visa's dominance and thus impede competition and unreasonably restrain trade in each relevant market. Compared to a more competitive market, the effects of these agreements include raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing prices, depressing price competition, restricted output or other services, and slowing innovation.

212.    These agreements are not reasonably necessary to accomplish any procompetitive goals. Any procompetitive benefits are outweighed by anticompetitive harm, and there are less restrictive alternatives by which Visa would be able to reasonably achieve any procompetitive goals.

213.    Plaintiffs and other members of the Class have been injured by paying more for goods and services from merchants that accept Visa Debit Cards than they would have in the absence of Visa's conduct.

### D.  Count Four: Unlawful Agreements that Restrain Trade in Violation of Sherman Act § 1

214.    Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

215.    Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services; and (2) the market for general purpose debit network services.

216.    Visa has market power in both relevant markets.

217.    These agreements contain penalties, cliff pricing terms, volume commitments, and other terms that unreasonably restrain competition, including by foreclosing a substantial share of each relevant market. These agreements make it difficult for competition from existing or potential rivals to challenge Visa's dominance and thus impeded competition and unreasonably restrain trade in each relevant market. The effects of these agreements include raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing prices, depressing price competition, reducing output or other services, and slowing innovation.

218.    These agreements are not reasonably necessary to accomplish any procompetitive goals. Any procompetitive benefits are outweighed by anticompetitive harm, and there are less restrictive alternatives by which Visa would be able to reasonably achieve any procompetitive goals.

219.    Plaintiffs and other members of the Class have been injured by paying more for goods and services from merchants that accept Visa Debit Cards than they would have in the absence of Visa's conduct.

### E.    Count Five: Violation of the Cartwright Act (Cal. Bus. & Professions Code §§ 16700 *et seq.*)[4]

220.    Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

---

[4] Plaintiffs bring this claim under the following states' laws: Arizona, Arkansas, California, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

221. At all relevant times, Visa intended to form and formed one or more trusts through a combination or conspiracy to accomplish purposes prohibited by and contrary to the public policy of the State of California.

222. Visa's actions constitute prohibited restraints on competition in violation of Business and Professions Code §§ 16720 et seq. in that the conduct alleged herein restricted competition and artificially inflated and/or maintained prices for debit card network services, and thus the prices of goods and services at the merchants that accepted Visa Debit Cards.

223. Visa's de facto exclusive dealing arrangements also violates Business and Professions Code § 16727, which makes it unlawful for "any person to lease or make a sale or contract…or to fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, merchandise, machinery, supplies, commodities, or services of a competitor or competitors of the lessor or seller, where the effect . . . may be to substantially lessen competition or tend to create a monopoly in any line of trade or commerce in any section of the State."

224. As a direct result of Visa's unlawful conduct, Plaintiffs and the Class members were overcharged when they purchased goods and services at merchants that accepted Visa Debit Cards.

225. Plaintiffs and other Class members are "persons" within the meaning of the Cartwright Act as defined in California Business and Professions Code § 16702.

226. Visa's conduct violates the Cartwright Act.

227. These violations are continuing and will continue unless enjoined by the Court.

228. Plaintiffs seek damages as set forth below and in this cause of action on behalf of themselves and all Class members against Visa, including but not limited to an injunction against Defendant preventing and restraining the violations alleged herein.

F.  **Count Six: Violation of Unfair Competition Law (Cal. Bus. & Professions Code §§ 17200 *et seq.*)**

229.    Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

230.    Visa's conduct constitutes a violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq., which protects consumers from unlawful, fraudulent, and unfair business practices.

231.    Plaintiffs bring this claim on behalf of themselves, members of the Class, and on behalf of the public as private attorneys general pursuant to Cal. Bus. & Prof. Code § 17204.

232.    Visa's conduct violates the Sherman Act, the Federal Trade Commission Act, and the Cartwright Act.  As such, Visa's acts also constitute unlawful conduct under section 17200. Visa unlawfully acquired and maintained monopoly over the relevant markets through anticompetitive conduct.

233.    Visa's conduct is unfair to Plaintiffs and Class members who, as a direct result of the acts described above, were charged more for goods and services at relevant merchants than they would have been but for Visa's anticompetitive conduct.

234.    Plaintiffs and Class members seek and are entitled to all forms of relief available under California's Unfair Competition Law.  Pursuant to § 17203, Plaintiffs and Class members seek from Visa restitution and disgorgement of all earnings, profits, compensation, benefits, and other ill-gotten gains obtained by Visa as a result of its conduct in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.*

235.    Pursuant to Cal. Bus. & Prof. Code § 17204, Plaintiffs and Class members seek an order enjoining Visa from continuing to engage in the acts as set forth in this Complaint. Plaintiffs, Class members, and the public will be irreparably harmed if such an order is not granted.

## XIV.   PRAYER FOR RELIEF

236.    WHEREFORE, Plaintiffs pray for a judgment in its favor and against Defendants for the following relief:

A.     That the Court certify this case as a class action and that it appoint Plaintiffs as class representatives and its counsel as class counsel;

B.     That the court declare, adjudge and decree that Visa has committed the violations of the laws alleged herein;

C.     That the Court award Plaintiffs and the proposed classes all appropriate monetary relief, whether by way of restitution or damages, including treble damages, or other multiple or punitive damages, or restitution, where mandated by law or equity or as otherwise available; together with recovery of the costs of suit, to include reasonable attorney's fees, costs, and expenses, together with pre- and post-judgment interest to the maximum levels permitted by law or equity;

D.     That the Court grant such additional orders or judgments as may be necessary to prevent the unlawful practices;

E.     That the Court order such other and further relief as the Court may deem just and proper.

## XV.   JURY DEMAND

237.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

Dated: October 21, 2024

**COTCHETT, PITRE & McCARTHY, LLP**

*/s/ Brian Danitz* _____

**KARIN B. SWOPE** (*Pro hac vice forthcoming*)
**THOMAS E. LOESER** (*Pro hac vice forthcoming*)
**VARA LYONS**
999 N. Northlake Way
Suite 215
Seattle, WA 98103
Telephone:  (206) 802.1272
Facsimile: (650) 697.0577
*tloeser@cpmlegal.com*
*kswope@cpmlegal.com*
*vlyons@cpmlegal.com*

**JOSEPH W. COTCHETT**
**BRIAN DANITZ**
**GIA JUNG** (*Pro hac vice forthcoming*)
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
*and*
40 Worth Street
Suite 602
New York, NY  10013
Telephone: (212) 381-6373
Facsimile: (917) 398-7753
*jcotchett@cpmlegal.com*
*bdanitz@cpmlegal.com*
*gjung@cpmlegal.com*

***Counsel for Plaintiffs and the Proposed Class***